STATE OF NORTH CAROLINA v. JOHN WESLEY OLIVER AND GEORGE MOORE, JR.

No. 78

(Filed 27 January 1981)

**1. Criminal Law § 15.1— pretrial publicity — denial of change of venue**

The trial court in a prosecution for first degree murder and armed robbery did not abuse its discretion in denying defendants' motion for change of venue based on pretrial publicity in radio broadcasts and newspaper articles where the articles were of a general nature likely to be found in any jurisdiction to which the trial might be moved; the coverage of defendants' arrest only indicated that defendants had been charged with a crime; the articles were factual, non-inflammatory, and contained for the most part information that could have been offered in evidence at defendants' trial; and no juror objected to by defendants because of pretrial publicity was seated on the jury.

**2. Criminal Law § 21.1— denial of post-indictment probable cause hearing**

The denial of defendants' post-indictment motions for a probable cause hearing did not violate G.S. 15A-606(a) or deprive defendants of equal protection and due process of law.

**3. Jury § 6— denial of individual voir dire — no abuse of discretion**

Defendants failed to show that the trial court abused its discretion in the denial of defendants' motion for an individual *voir dire* of each juror and sequestration of the jurors during *voir dire*.

**4. Jury § 7.11— opposition to capital punishment — excusal for cause**

The trial court in a first degree murder prosecution properly excused for cause prospective jurors who admitted a specific inability to impose the death penalty under any circumstances.

**5. Constitutional Law § 63; Jury § 7.11— exclusion of jurors for capital punishment views — cross-section of community**

There is no merit in defendants' contention that the "death qualification" jury selection process in a first degree murder case deprived them of a jury selected from a representative, fair cross-section of the community on the guilt phase of the case.

State v. Oliver

**6. Jury § 6.4— excusal of jurors for capital punishment views — absence of questioning by defense counsel**

When challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor and by the court, the court does not abuse its discretion, at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow defendant to question the juror challenged.

**7. Criminal Law § 91— statutory speedy trial — exclusion of time pending motion for change of venue**

A motion for change of venue is a "pretrial motion" within the meaning of G.S. 15A-701(b)(1)(d), and the time between the filing of the motion and its disposition is properly excluded in computing the statutory speedy trial period provided the motion is heard within a reasonable time after it is filed and the State does not delay the hearing for the purpose of thwarting the speedy trial statute.

**8. Criminal Law § 102.6— use of gun in jury argument**

It was not improper for the prosecutor to use in his jury argument a revolver which had been offered in evidence in the trial so long as he did not attempt to draw any inferences from the weapon which were not supported by the evidence or to frighten or intimidate the jury with it.

**9. Indictment and Warrant § 7.1— allegation of defendant's residence — surplusage**

The trial court properly denied defendant's motion to dismiss murder indictments against him on the ground they described him as being a resident of Robeson County when in fact he resided in Columbus County since defendant's residence was immaterial and the allegations as to his county of residence were at most surplusage.

**10. Constitutional Law § 30; Criminal Law § 91.6— discovery of pistol short time before trial — denial of continuance**

The trial court in a murder and armed robbery case did not err in the denial of defendant's motion for a continuance of his trial made on the ground that the court had ordered that discovery be completed two weeks before trial and he did not have a full two weeks before his trial commenced on 14 May to view a pistol discovered by the State on 2 May where the State informed defendant's attorney on 3 May of the discovery; defendant's attorney chose not to view the weapon until 9 May after which he received by mail a copy of a permit to purchase the pistol issued to defendant; no ballistics analysis was possible because the bullet which killed one victim could not be found and the bullet which killed the second victim was badly fragmented; and defendant's preparation for trial was thus in no way inhibited by the late discovery of the pistol.

**11. Criminal Law §§ 66.10, 66.17— unnecessarily suggestive showup procedure — inherent reliability of identification — admissibility of pretrial and in-court identifications**

Although an officer's statement to a seven-year-old witness that he would be

State v. Oliver

taken to the police station where he "could see that man again" coupled with a showup procedure in which the witness viewed the defendant singly through a two-way mirror constituted an unnecessarily suggestive pretrial identification procedure, the witness's identification of defendant was inherently reliable considering the totality of circumstances and did not create a substantial likelihood of misidentification so that both his out-of-court and in-court identifications of defendant were admissible in evidence where the witness was no casual observer but was a witness to the slaying of his own grandfather; he had ample opportunity to view his grandfather's assailant since the shooting occurred near him, in an open area, outside, and during daylight; he gave an accurate description of defendant prior to the showup; his identification was consistent, unequivocal and made without the slightest hesitancy or uncertainty; he was careful not to implicate a codefendant whom he also viewed singly through the two-way mirror but was quite firm in his consistent identification of defendant; and the length of time between the crime and the confrontation was no more than a few hours.

### 12. Arrest and Bail § 9— bail in capital case — discretion of court

Whether a defendant charged with a capital offense is entitled to a bail bond is a matter in the discretion of the trial judge. G.S. 15A-533.

### 13. Jury § 7.8— denial of challenge for cause of juror based on health

The trial court did not abuse its discretion in the denial of defendant's challenge for cause of a 65-year-old juror who stated that she had a history of heart trouble, took medication daily for high blood pressure, utilized nitroglycerin if she experienced pain or became upset, was not sure her health would allow her to sit for more than one day and felt that a trial lasting more than a week would be too strenuous where the trial court fully questioned the juror about her health and observed that the work of a juror was not strenuous, that often veniremen with heart conditions serve on a jury, and that counsel on both sides had agreed that the trial would not last more than a week.

### 14. Witnesses § 1.2— competency of youthful witness — leading questions on voir dire

The trial court did not abuse its discretion in ruling that a seven-year-old boy was a competent witness in a murder and armed robbery case or in permitting the prosecutor to ask the youthful witness leading questions during the *voir dire* examination to determine his competency.

### 15. Criminal Law § 33.1— observations of witnesses — relevancy

The trial court in a first degree murder and armed robbery case did not err in the admission of a witness's testimony that he saw two boys walking toward the crime scene shortly before the crimes occurred and that they were "dark people" and another witness's testimony tending to show that clothing he saw one defendant wearing on the day before the crimes matched the description of such defendant's clothing on the day of the crimes; furthermore, such testimony could not have had the purpose of inflaming the jury and would be, at most, harmless error.

### 16. Criminal Law § 88.1— cross-examination to show bias or prejudice

The district attorney was properly permitted to ask a defense witness on

State v. Oliver

cross-examination, "Brown, you will do anything to cover up for your old friend, won't you?" and "Were you covering up for your old buddy and cell mate sitting over there at the next table?" since the questions were designed to show bias and prejudice on the part of the witness, and this is a proper function of cross-examination.

### 17. Criminal Law § 42.2— physical evidence connected with crime — failure to show objects had undergone no material change

In this prosecution for first degree murder and armed robbery, two "football candies," a toboggan, candy wrappers, a red pullover shirt with a hood, and a pistol and bullets were not inadmissible because the State failed to offer positive testimony that the objects had undergone no material change where all of the items were positively identified as being the very items recovered by those investigating the incident in question; there was no evidence that the condition of any of the items had changed between the time of their recovery on the day of the crimes and the day of trial; the very nature of the items themselves would make a change in condition extremely unlikely in the short time between the commission of the crimes and the trial; and the fact that the items had undergone no material change was clearly implied in the testimony of the officer who identified them.

### 18. Criminal Law § 33.1— relevancy of candies and toboggan

In this prosecution for first degree murder and armed robbery, evidence that candy wrappers discovered in the pocket of a jacket found in a truck used by defendants matched in appearance wrappers on candy found on the counter of the store where the crimes occurred was relevant as a circumstance tending to show that defendants had, at some time, been in the store, and a dark toboggan, also found in the truck, was relevant inasmuch as a witness observed one defendant wearing a dark toboggan shortly after the crimes were committed.

### 19. Criminal Law §§ 10.3, 11— failure to charge on accessory before or after the fact

The trial court did not err in failing to instruct as to one defendant on the offenses of accessory before and accessory after the fact to the crimes of armed robbery and murder where the evidence showed that both defendants were present at the scene and were acting together in the commission of the armed robbery, and that the murders occurred in furtherance of their common purpose to commit this crime or as a natural consequence thereof.

### 20. Criminal Law § 135.4— conviction under felony-murder rule — underlying felony not aggravating circumstance

Where defendants were convicted of the capital offense of first degree murder on the theory that the murder was committed during the perpetration of an armed robbery, it was error for the court to submit the underlying felony of armed robbery to the jury in the sentencing phase of the trial as an aggravating circumstance, and defendants who were sentenced to death are entitled to a new sentencing hearing since the jury may well have decided that the remaining aggravating circumstances were not sufficiently substantial to call for imposition of the death penalty had the jury not considered the underlying felony as an aggravating circumstance.

**21. Criminal Law § 135.4— first degree murder — sentencing hearing — aggravating circumstance of especially heinous, atrocious, or cruel crime**

The trial court properly submitted to the jury the aggravating circumstance as to whether the first degree murder of a storekeeper was "especially heinous, atrocious or cruel" where the State's evidence showed that the storekeeper, after opening his cash register in response to defendants' demands, begged for his life and that one defendant mercilessly shot him to death. However, the trial court erred in submitting the aggravating circumstance as to whether the death of an innocent bystander was "especially heinous, atrocious or cruel" where the State's evidence showed that one defendant, as he was running from the store, shot and killed the bystander who had pulled up to purchase gas, there was no unusual infliction of pain or suffering on the victim, and the brutality of the killing did not exceed that normally present in a case of first degree murder.

**22. Criminal Law § 135.4— first degree murder — sentencing hearing — competency of criminal record**

Portions of defendant's criminal record which were read to the jury during the sentencing phase of a first degree murder case were relevant and competent to negate evidence that defendant had no significant history of prior criminal activity which was submitted to the jury on his behalf as a possible mitigating circumstance.

**23. Criminal Law § 135.4— murder committed in perpetration of robbery — submission of aggravating circumstance of commission for pecuniary gain**

In a prosecution for the first degree murder of a storekeeper during the perpetration of an armed robbery and the first degree murder of an innocent bystander who had pulled up to the store to purchase gas, the trial court properly submitted to the jury during the sentencing phase of the trial the aggravating circumstance as to whether the bystander was murdered for "pecuniary gain" although the evidence showed that the money had already been obtained from the storekeeper at the time the bystander was shot, since the murder of the bystander was apparently committed in an effort to eliminate a witness to the robbery, and the jury could find that both murders were committed for the purpose of permitting the defendants to enjoy pecuniary gain.

**24. Criminal Law § 135.4— murder committed in perpetration of robbery — submission of aggravating circumstance of commission for pecuniary gain**

There is no error in submitting the aggravating circumstance as to whether a murder was committed "for pecuniary gain" in a felony-murder case in which the underlying felony is robbery notwithstanding the rule that the robbery itself cannot be submitted as such a circumstance, since the circumstance that the capital felony was committed for pecuniary gain does not constitute an element of the offense.

Justice MEYER did not participate in the consideration and decision of this case.

BEFORE *Judge Donald L. Smith* presiding at the 14 May 1979 Session of ROBESON Superior Court, defendants were convicted by a jury of armed robbery and two counts of murder in the first

degree. At the sentencing phase of the trial[1] the jury recommended that defendant Moore be sentenced to life imprisonment for the murder of Dayton Hodge and to death for the murder of Allen Watts. As to defendant Oliver the jury recommended death in both murder cases. From judgments imposing life sentences in the robbery cases and sentences according to the jury's determination in the murder cases, defendants appeal of right to this Court pursuant to G.S. 7A-27.

*Rufus L. Edmisten, Attorney General, by Tiare Bowe Smiley, Assistant Attorney General, for the state.*

*Murchison, Fox & Newton, by Frank B. Gibson, Jr., Attorneys for defendant appellant Oliver.*

*Robert D. Jacobson, Attorney for defendant appellant Moore.*

EXUM, Justice.

Defendants assign a multitude of errors to the guilt and sentence determination phases of the trial. Many are frivolous; because, however, this is a capital case, we touch upon them all.[2] We find no error in the guilt phase warranting a new trial. For error in the sentencing phase we vacate the death sentences and remand those cases in which the death penalty was imposed for new sentencing hearings and determinations.

The state's evidence tends to show as follows:

On the morning of 12 December 1978 Bobby Hodge, a seven-year old boy at the time of trial, rode with his grandfather, Dayton Hodge, to Watts' Convenient Mart in Fairmont. The store was operated by Allen Watts. While Dayton Hodge was putting gas in his truck Bobby saw a man, whom he identified as defendant Oliver, run from Watts' store with a pistol in his hand. This man shot his grandfather at close range with the pistol and then "ran to

---

[1] North Carolina General Statute 15A-2000 requires a separate proceeding to determine the sentence of a defendant convicted of the capital felony of first degree murder.

[2] Not only are many of the assignments of error frivolous, but the briefs are poorly organized, difficult to follow, and on the whole unpersuasive. We have nevertheless examined the case with care to insure that the convictions and sentences are free from prejudicial error.

State v. Oliver

the woods." Shortly thereafter, at approximately 9:35 a.m., Mitchell Ivey was driving by Watts' store. He observed a "tall guy running away" wearing a long brown coat with a "silver shiny object in his hand." He then saw another person wearing "something red." "The first guy was running. The big, tall guy was running and the little guy turned around and started running maybe ten feet away . . . ." Bobby Hodge flagged Ivey, and Ivey stopped. Ivey observed Dayton Hodge lying beside his truck with blood on his head and on the pavement. He went inside the store and found Allen Watts lying on his back with "blood all on his side." Ivey telephoned police. Ivey identified defendants Moore and Oliver as the persons he saw running down the shoulder of the road.

Emergency medical technicians with the Robeson County Ambulance Service arrived and transported both Dayton Hodge and Allen Watts to Southeastern General Hospital in Lumberton. When they arrived at the scene neither Dayton Hodge nor Allen Watts displayed any vital signs. Hodge died from a bullet which entered the back of his neck and lacerated his spinal cord. Watts died from a bullet which entered the right side of his forehead and pierced his brain. Both entry wounds were about three-eighths inches in diameter.

Robeson County deputy sheriffs arrived at the scene at approximately 9:50 a.m. They searched a wooded area around the Square Deal Warehouse, near which was parked a white over brown Chevrolet truck approximately two to three tenths of a mile north of Watts' store on Highway 41. They apprehended defendants Oliver and Moore in the wooded area. Oliver jumped up from some thick underbrush with his hands up and was handcuffed. They discovered Moore some 81 feet away lying in a ditch. They found a paper sack containing $225.00 cash in ones, fives, and tens, and fifty-three $1.00 foodstamps in the ditch near where Moore was lying. Moore wore a red sweatshirt with a hood. Thirty minutes after deputies apprehended defendants they returned to the area and found a long, brown coat partially submerged in water in the ditch.

Johnny Lee Lewis, while an inmate in the Robeson County jail on 18 January 1979, overheard defendant Moore talking with other inmates. Moore said he was "in Mr. Watts' store two or three times that week, and on the night before the shooting." Moore said before he left home on 12 December 1978 "he started to take his 12-gauge shotgun and changed his mind at the last minute." He went to

Watts' store and got candy and a drink. When Watts opened the cash register, Moore said, "he pulled out a gun and Mr. Watts said 'Please don't shoot me. Go ahead and take the money.'" Then Moore "just shot Mr. Watts and then laid the gun on the counter."[3]

Other circumstantial evidence strongly implicated both defendants Moore and Oliver as principal perpetrators of the two murders and the robbery. William Lands sold Oliver a .38 caliber pistol and a black holster in August 1978. On 30 April 1979 deputies returned to the wooded area where they had earlier apprehended defendants. They found the pistol sold to Oliver, partially buried, in the area some 600 feet from where defendants were apprehended. Marion Eady sold Oliver a 1972 Chevrolet, white over brown pickup truck on 22 September 1978. This truck was parked near the Square Deal Warehouse on the day of the crimes.

On the evening of 11 December 1978, shortly after 7:00 p.m., defendants came into Watts' store and "just walked around and looked and turned and went down the middle aisle and then came back up the first aisle." Oliver bought vienna sausages. Then the men "moved around in the store continuously." They walked "up and down the aisles for seven to eight minutes." Defendants were seen together at 8:00 a.m. on 12 December 1978 in a "brown pickup truck." Another witness observed two men walking toward Watts' store at approximately 9:00 a.m. on 12 December. One had on "something red. Looked like maybe a red hood. And the other one had on a coat about knee-length." Yet another witness identified both Moore and Oliver in Watts' store on 12 December at approximately 9:15 a.m.

Witnesses who observed defendants at or near the time of the crimes consistently said Oliver was wearing a long, knee-length coat similar to that found in the woods near where he was arrested. They said Moore was wearing a red sweatshirt with a hood on it like that which he was wearing at the time of his arrest. Another witness said Moore was wearing a dark toboggan.

---

[3] Out of the presence of the jury on *voir dire* Johnny Lee Lewis testified that Moore also said, "Oliver picked the gun up off the counter and he carried the money out of the store." The trial judge assiduously prevented any out-of-court statement made by Moore which tended to implicate defendant Oliver from being placed before the jury so as to avoid violating the rule laid down in *Bruton v. United States*, 391 U.S. 123 (1968).

---

**State v. Oliver**

---

Oliver's fingerprints were found on the Chevrolet truck parked at the Square Deal Warehouse. Found in the truck was the black holster sold to Oliver by William Lands; a blue coat similar to that which some witnesses said Moore had worn over his red sweatshirt; and a black toboggan. In the right pocket of the blue coat were several pieces of multi-colored Christmas candy wrapping paper which matched the paper on candies found on the counter of Watts' store on the day of the crimes.

Defendants offered evidence as follows:

Oliver's father testified that although Oliver lived with him, he had never seen the long, brown coat allegedly worn by his son, nor had he ever seen his son with a pistol.

According to the testimony of state's witness Johnny Lee Lewis, Robert Earl Brown was one of those inmates to whom Moore made incriminating statements. Brown, testifying for Moore, denied that the conversation ever occurred. He related several exculpatory statements made by Moore.

Defendants filed separate briefs. Assignments of error in the guilt phase made by both defendants will be discussed in Part I of the opinion. Assignments of error in the guilt phase raised only by defendant Oliver will be discussed in Part II; assignments of error in the guilt phase raised only by defendant Moore, in Part III; and errors assigned in the sentencing phase of the trial, in Part IV.

I.

[1] Defendants first assign error in the denial of their motion for a change of venue.[4] Defendants allege that adverse pre-trial publicity precluded their receiving a fair trial in Robeson County. In support of the motion defendants offered newspaper clippings, transcripts

---

[4] Motions for a change of venue are governed by G.S. 15A-957:

"*Motion for change of venue.*—If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:
  (1)  Transfer the proceeding to another county in the judicial district or to another county in an adjoining judicial district, or
  (2)  Order a special venire under the terms of G.S. 15A-958.
   The procedure for change of venue is in accordance with the provisions of Article 3 of this Chapter, Venue."

of radio and television news broadcasts and the testimony of five media representatives. Evidence offered or stipulated tended to show: The *Robesonian*, a local newspaper with a circulation of about 14,000, printed five articles discussing the murders and the apprehension of defendants. The *Fairmont Town Messenger*, a newspaper with a circulation of approximately 1,750, printed six such articles. The *Whiteville News Reporter*, a newspaper with a circulation of approximately 40 in Robeson County, published one such article. Broadcasts concerning the pending trial from WTSB radio, reaching an indeterminable number of persons throughout Robeson County, were made on nine different days. In addition, an undetermined number of broadcasts were made by WAGR radio reaching an indeterminable number of persons in Robeson County. The trial court took judicial notice of the fact that Robeson County has a population of approximately 90,000 persons.

A motion for change of venue is addressed to the sound discretion of the trial judge and his ruling will not be overturned on appeal in the absence of an abuse of discretion. *State v. Barfield*, 298 N.C. 306, 320, 259 S.E. 2d 510, 524 (1979), *cert. denied*, ____ U.S. ____, 65 L. Ed. 2d 1137, 100 S.Ct. 3050 (1980). In *State v. Alford*, 289 N.C. 372, 222 S.E. 2d 222, *death sentence vacated*, 429 U.S. 809 (1976), the defendant offered exhibits similar to those relied on here in support of his motion for change of venue. In *Alford* we concluded that with the exception of the coverage of the defendant's arrest, the articles were of a general nature likely to be found in any jurisdiction to which the trial might be moved. Here, as in *Alford*, the coverage of the arrests only indicated that defendants had been charged with a crime. The articles were factual, non-inflammatory, and contained for the most part information that could have been offered in evidence at defendants' trial.

Judge Gavin, who ruled on the motions for change of venue, fully considered defendants' arguments. When the jury was selected at trial, defendants were allowed adequate opportunity for *voir dire* examination of potential jurors. No juror objected to by defendants because of pre-trial publicity was seated on the jury.

The burden of showing "so great a prejudice" by reason of pretrial publicity that a defendant cannot receive a fair trial is on defendant. *State v. Faircloth*, 297 N.C. 100, 105, 253 S.E. 2d 890, 893 (1979). Defendants did not successfully carry this burden. The motion for change of venue was properly denied.

**[2]** Defendants next challenge the denial of their motions for a probable cause hearing. At defendants' first appearance in this matter a probable cause hearing was scheduled for 20 December 1978. The state's request for a continuance was granted and the hearing rescheduled for 4 January 1979. The grand jury returned indictments against defendants on 2 January 1979. Defendants Oliver and Moore moved, respectively, for a probable cause hearing on 25 January and 22 January 1979. The motions were denied. Defendants contend that not affording them a probable cause hearing conflicts with the controlling North Carolina statute and is a denial of equal protection and due process of law. We do not agree.

The North Carolina statute upon which defendants rely is G.S. 15A-606(a):

> "*Demand or waiver of probable-cause hearing.*—(a) The judge must schedule a probable-cause hearing unless the defendant waives in writing his right to such hearing. A defendant represented by counsel, or who desires to be represented by counsel, may not before the date of the scheduled hearing waive his right to a probable-cause hearing without the written consent of the defendant and his counsel."

Defendants maintain that this section changes our former rule which allowed trial following indictment without a probable cause hearing. *State v. Vick*, 287 N.C. 37, 213 S.E. 2d 335 (1975), *cert. dismissed*, 423 U.S. 918 (1975). Defendants' argument was fully considered and rejected by this Court in *State v. Lester*, 294 N.C. 220, 240 S.E. 2d 391 (1978). It would serve no good purpose to repeat the rationale of *Lester;* suffice it to say that we see no need to disturb the conclusion we reached in that case.

*Lester* also disposes of defendants' claim that failure to provide them a probable cause hearing denied them due process and equal protection under the North Carolina and United States Constitutions. "[N]either [constitution] requires a preliminary hearing as a necessary step in the prosecution of a defendant." *Id.* at 224, 240 S.E. 2d at 396. Since *Lester*, the California Supreme Court has concluded that deprivation of a post-indictment probable cause hearing denies a defendant equal protection of the law as guaranteed by the *California* Constitution. *Hawkins v. Superior Court*, 22 Cal. 3d 584, 586 P. 2d 916, 150 Cal. Rptr. 435 (1978). The rationale of

*Hawkins* has been rejected expressly by Nevada, *Seim v. State*, 95 Nev. 89, 590 P. 2d 1152 (1979), and Illinois, *People v. Franklin*, 80 Ill. App. 3d 128, 398 N.E. 2d 1071 (1979). Federal courts have uniformly held that a defendant is not constitutionally entitled to a probable cause hearing following a grand jury indictment. *Harris v. Estelle*, 487 F. 2d 1293 (5th Cir. 1974); *United States v. Anderson*, 481 F. 2d 685 (4th Cir. 1973), *aff'd* 417 U.S. 211 (1974); *United States v. LePera*, 443 F. 2d 810 (9th Cir. 1971), *cert. denied*, 404 U.S. 958 (1971); *United States v. Conway*, 415 F. 2d 158 (3d Cir. 1969), *cert. denied*, 397 U.S. 994 (1970). We continue to adhere to our decision in *Lester*. This assignment of error, consequently, is overruled.

[3]  Defendants assign as error the trial court's denial of their motion for sequestration of jurors and individual *voir dire* of jurors. The *voir dire* procedure used followed the pattern approved by this Court in *State v. Barfield, supra.* Twelve prospective jurors were seated in the jury box, and the remainder of the jury pool was sequestered outside the courtroom until a replacement was needed for a venireman who had been excused. Defendants contend the record shows that jury selection became more difficult as it wore on because jurors realized that by expressing adamant opposition to the death penalty they would be excused. Defendants allege that this produced a kind of "domino effect" alluded to by defendant in *Barfield*, and resulted therefore in the impaneling of an unrepresentative jury. As we did in *Barfield*, we now conclude this argument to be speculative at best and unpersuasive. The record does not support defendants' contentions. These motions were addressed to the sound discretion of the court whose rulings will not be disturbed except for an abuse of discretion. *State v. Barfield, supra*, 298 N.C. at 323, 259 S.E. 2d at 526; *State v. Thomas*, 294 N.C. 105, 240 S.E. 2d 426 (1978). Defendants have shown no abuse. The assignment of error is overruled.

[4—6]  With regard to the jury selection process defendants first allege the trial court committed error in allowing the state to challenge for cause certain jurors who voiced general objections to capital punishment or expressed only conscientious or religious scruples against the death penalty. A close examination of the record belies defendants' contentions on this point. Rather, jurors were excused for cause only where they admitted a specific inability to impose the death penalty under any circumstances. Thus the

challenges met the *Witherspoon*[5] test. *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979); *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, ____ U.S. ____, 64 L. Ed. 2d 796, 100 S.Ct. 2165 (1980). Defendants next contend that the "death qualification" jury selection process deprived them of a jury selected from a representative, fair cross-section of the community on the guilt phase of the case. This argument was expressly rejected by a majority of the Court in *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1979). Finally, defendants also complain of the trial court's refusal to allow defendants to ask additional questions of jurors disqualified because of their opposition to the death penalty. When challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor and by the court, the court does not abuse its discretion, at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow the defendant to question the juror challenged. *See State v. Harris*, 283 N.C. 46, 194 S.E. 2d 796 (1973), *cert. denied*, 414 U.S. 850 (1973). Since defendants have made no showing that additional questioning would likely have produced different answers, their position is without merit.

**[7]** Defendants moved in the trial court on 11 May 1979 to dismiss the charges because their statutory right[6] to a speedy trial under G.S. 15A-701[7] was violated. The statute requires a defendant's trial to begin "[w]ithin 120 days from the date the defendant is arrested, served with criminal process, waives an indictment, or is indicted, whichever occurs last." G.S. 15A-701(a1)(1) (1980 Interim Supplement). Defendants here were indicted on 2 January 1979; trial began on 14 May 1979, more than 120 days thereafter. But 15A-701(b) goes on to provide:

"The following periods shall be excluded in computing the time within which the trial of a criminal offense must begin:

---

[5] *Witherspoon v. Illinois*, 391 U.S. 510 (1968), *reh. denied*, 393 U.S. 898 (1968).

[6] Defendants raise no claim that their Sixth Amendment speedy trial right was denied.

[7] The statute applies to a defendant "who is arrested, served with criminal process, waives an indictment or is indicted, on or after October 1, 1978, and before October 1, 1981 . . . ." G.S. 15A-701(a1) (1980 Interim Supplement).

> (1) Any period of delay resulting from other proceed-
> ings concerning the defendant including, but not
> limited to, delays resulting from . . . .
>
>> d. Hearings on pretrial motions or the granting or
>> denial of such motions . . . ."

Defendant Moore filed a motion for change of venue[8] on 27 December 1978. Defendant Oliver filed such a motion on 5 January 1979. Both motions for change of venue were heard and denied on 25 January 1979. In denying the motions to dismiss Judge Smith ruled that the filing of a motion for change of venue tolls the running of the 120-day statutory period until the motion is determined.

Defendant Moore contends that since the calendaring of a hearing on a change of venue motion is controlled by the state, the period during which the motion is pending should not be excluded from the statutory speedy trial period. He maintains that his motion could have been heard on 2 January 1979, the date of the indictment. Thus only the days between 27 December and 2 January should be excluded. We reject this argument. While motions should be promptly calendared for hearing, both sides are entitled to a reasonable time within which to prepare. We conclude that a motion for change of venue is included within the statutory reference to "pretrial motions." G.S. 15A-701(b)(1)(d). Provided the motion is heard within a reasonable time after it is filed and the state does not delay the hearing for the purpose of thwarting the speedy trial statute, the time between the filing of the motion and its disposition is properly excluded in computing the time within which a trial must begin. The time here between filing and disposition of the motion, 29 days, we find to be a reasonable time. There is nothing in the record to show any purposeful delay on the part of the state. Therefore this time was properly excluded by Judge Smith; there was no error in his denial of defendant Moore's motion.

Defendant Oliver argues that only those motions whose determination will necessarily delay the date of trial beyond the 120-day period should be considered within the meaning of G.S. 15A-701(b)(1)(d). Since the motion for change of venue *was determined* well

---

[8] Defendants also filed motions for discovery, a bill of particulars, a pre-trial release order, individual *voir dire* and sequestration of jurors, dismissal, and for a probable cause hearing.

before the expiration of the 120-day period, the state's opportunity to try defendant within the period was not affected and the trial date was not necessarily delayed by the motion. This argument has some merit; but we reject it insofar as it applies to motions for change of venue. The state is in fact stymied in its scheduling of any case for trial until a ruling is made on such a motion. A motion for change of venue so long as it is pending must necessarily delay the setting of a case for trial until it is determined, and this is so whether the determination be soon after the 120-day period begins to run or at some later time within the period. We believe the legislature intended through G.S. 15A-701(b)(1)(d) to exclude from the 120-day speedy trial period all time reasonably required to determine any motion the determination of which must be made before a case can be scheduled for trial. A motion for change of venue, as we have noted, is such a motion. The motion here was determined within a reasonable time. Judge Smith, therefore, properly excluded the time during which this motion was pending. Oliver's assignment of error to Judge Smith's denial of his motion is overruled.

[8] Defendants assign as error the failure of the trial court to award a mistrial because of alleged prosecutorial misconduct during the state's closing argument in the guilt phase. The record shows that the prosecutor on one occasion waved before the jury the .38 caliber revolver which was offered in evidence in the trial. On another occasion he made a reference to the weapon while displaying it to the jury. Defendants' objections were overruled. The rulings were proper. The gun was in evidence. It was not improper for the prosecutor to utilize it in his summation so long as he did not attempt to draw inferences from the weapon which were not supported by the evidence or to frighten or intimidate the jury with it. The prosecutor may argue "the facts in evidence and all reasonable inferences to be drawn therefrom . . . ." *State v. Covington*, 290 N.C. 313, 226 S.E. 2d 629 (1976). The record reveals no improper use of the weapon in the prosecutor's closing argument.

Defendants contend that all charges against them should have been dismissed at the close of the evidence on the ground that the evidence was insufficient to be submitted to the jury. The contention is frivolous. There was substantial evidence of all elements of each offense of which the defendants were convicted. Their assignments of error directed to the denials of their motion to dismiss for

insufficiency of the evidence are overruled.

## II.

We turn now to the guilt phase assignments of error brought forward by defendant Oliver.

[9]    Defendant Oliver claims error in the trial court's denial of his motion to dismiss the murder indictments on the ground they described him as being a resident of Robeson County when in fact he resided in Columbus County. The indictments recited that "John Wesley Oliver, late of the County of Robeson . . ." committed the offenses charged. Defendant's argument is, of course, frivolous. His residence is immaterial. General Statute 15A-924 requires a criminal pleading to contain "[t]he name or other identification of the defendant . . . ." The indictments contained defendant's name. The allegations as to his county of residence, if this is what was intended by the language in the indictment, is at most surplusage. Consequently any such error is not fatal. The motion to dismiss was properly denied.

[10]    Defendant Oliver assigns as error the denial of his motion for a continuance filed 8 May 1979 as a result of the discovery, on 2 May 1979, of the .38 caliber pistol. In the original discovery order entered 24 January 1979, the presiding judge had ordered that all discovery be completed two weeks before the trial. Defendant Oliver contends this order was violated because he was unable to view the pistol a full two weeks before the trial commenced on 14 May 1979. The argument is frivolous. The state could not produce what it had not yet discovered. The day after the discovery of the weapon, 3 May, the state informed defendant Oliver's attorney that the weapon had been discovered. Defendant's attorney, however, chose not to view the weapon until 9 May after which the attorney received by mail a copy of the permit for the purchase of the weapon issued to defendant Oliver. The bullet which killed Hodge could not be located, and the bullet which killed Watts was badly fragmented. No ballistics analysis was possible. Defendant's preparation for trial was in no way inhibited by the late discovery of this pistol. There was no error in denying the motion for continuance.

[11]    Defendant Oliver claims error in the denial of his motion to suppress both the out-of-court and in-court identifications of him by the witness Bobby Hodge. A *voir dire* was conducted on the motion. The uncontradicted testimony of Deputy Sheriff Joel Locklear and

the witness Bobby Hodge on *voir dire* tended to show as follows: Shortly after the incident Bobby Hodge described his grandfather's assailant to Deputy Locklear as being a black man about the same height as Locklear with hair "all over his face," wearing a long coat, and wielding a pistol about the same color as the deputy's with a brown handle. Bobby was then taken to the police station where he was told that "I could see that man again." At the police station, before any formal charge was made against defendants, Bobby first viewed defendant Moore through a two-way mirror. Bobby said that he had never seen Moore before. Moore was removed, and defendant Oliver was led into the room for Bobby's viewing. Bobby upon seeing Oliver immediately and unhesitatingly identified him as the man who had shot his grandfather, "except," Bobby said, "he had on a long coat down to here." At that time Deputy Locklear instructed the other officers to go out and look for a coat, "because that little boy knew what he was talking about." Moore was then led back into the room in order to give Bobby another opportunity to see him. Moore and Oliver were then in the viewing room together. Bobby said that he had never seen Moore before but repeated his identification of Oliver as the man who had shot his grandfather. When asked, "Are you sure, son?" Bobby replied, "I'm sure that's the man . . . ." During *voir dire* Bobby also identified Oliver in the courtroom as being the man who shot his grandfather. Upon this evidence Judge Smith concluded that both the out-of-court identification procedure and Bobby's in-court identification of defendant Oliver were admissible into evidence. Before the jury Bobby Hodge unhesitatingly and without equivocation identified defendant Oliver as the man who shot his grandfather. He also testified regarding his actions at the pre-trial identification procedure.

Defendant Oliver contends that the out-of-court confrontation between the witness Bobby Hodge and Oliver "was so unnecessarily suggestive and conducive to irreparable mistaken identification that he [Oliver] was denied due process of law," *Stovall v. Denno*, 388 U.S. 293, 302 (1967); therefore Hodge's in-court and out-of-court identification of Oliver should have been suppressed. We disagree.

Both the United States Supreme Court and this Court have criticized the "practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup . . . ." *Stovall v.*

*Denno, supra,* 388 U.S. at 302; *State v. Matthews,* 295 N.C. 265, 245 S.E. 2d 727 (1978), *cert. denied,* 439 U.S. 1128 (1979); *State v. Henderson,* 285 N.C. 1, 203 S.E. 2d 10 (1974), *death sentence vacated,* 428 U.S. 902 (1976). This Court has recognized that such a procedure, sometimes referred to as a "showup," may be "inherently suggestive" because the witness "would likely assume that the police had brought [him] to view persons whom they suspected might be the guilty parties." *State v. Matthews, supra,* 295 N.C. at 385-86, 245 S.E. 2d at 739. We find, consequently, that the investigator's statement to Bobby Hodge to the effect that the boy would be taken to the police station where he "could see that man again" coupled with the showup procedure was unnecessarily suggestive.

This determination, however, does not end our inquiry. In all investigatory identification procedures "the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" *Neil v. Biggers,* 409 U.S. 188, 198 (1972). When the pre-trial investigatory identification procedures have created a likelihood of irreparable misidentification, neither the pre-trial procedures nor an in-court identification is admissible. *Id., United States v. Simmons,* 390 U.S. 377 (1968). Stated another way, in-court identifications are permissible "only if the out-of-court suggestiveness was *not* 'conducive to irreparable mistaken identify.' In this jurisdiction, this often meant that the in-court identification was admissible if the state could show that the in-court identification was of independent origin from the suggestive pre-trial procedures." *State v. McCraw,* 300 N.C. 610, 614, 268 S.E. 2d 173, 176 (1980). If an out-of-state identification procedure is so suggestive that it leads to a substantial likelihood of misidentification, the out-of-court identification is inadmissible. *Neill v. Biggers, supra.*

Suggestive pre-trial identification procedures, even if unnecessary, do not create a substantial likelihood of misidentification so as to preclude an in-court identification nor are the pre-trial proce- 601, 260 S.E. 2d 629 (1979); *State v. Headen,* 295 N.C. 437, 245 S.E. stances surrounding the crime itself "the identification possesses sufficient aspects of reliability." *Manson v. Brathwaite,* 432 U.S. 98, 106 (1977); *State v. McCraw, supra; State v. Nelson,* 298 N.C. 573, 601, 260 S.E. 2d 629 (1979); *State v. Headen,* 295 N.C. 437, 245 S.E. 2d 706 (1978). As the Supreme Court noted in *Manson,* 432 U.S. at 114:

"[R]eliability is the lynchpin in determining the admissi-

> bility of identification testimony. . . . The factors to be considered are set out in Biggers, 409 U.S. at 199-200 . . . . These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself."

This Court has applied *Manson* in at least three recent cases so as to conclude that an in-court identification was admissible despite possible unnecessarily suggestive out-of-court identification procedures. *State v. McCraw, supra; State v. Nelson, supra; State v. Headen, supra. Manson,* itself, dealt with an unnecessarily suggestive pre-trial identification confrontation. The Supreme Court concluded that notwithstanding its suggestiveness it was admissible because after weighing the factors indicating reliability of the identification against the corrupting effect of the suggestiveness itself, the conclusion was inescapable that the identification was reliable and therefore admissible.

So it is here. Considering the totality of circumstances and applying the standards laid down in *Biggers* and *Manson,* we conclude that Bobby Hodge's identification of Oliver was inherently reliable so that both his out-of-court and in-court identifications were properly admitted into evidence. Bobby had ample opportunity to view his grandfather's assailant since the shooting occurred near him, in an open area, outside, during daylight. Bobby was no casual observer but a witness to the slaying of his own grandfather. He gave an accurate description of Oliver prior to the showup. His identification was consistent, unequivocal and made without the slightest hesitancy or uncertainty. Bobby, consequently, was not as subject to suggestion as would have been the case with a witness who was less sure of the appearance of the suspect. Bobby's independence of mind was further demonstrated by the fact that he was quite careful not to implicate defendant Moore but was quite firm in his consistent identification of defendant Oliver. Finally the length of time between the crime and the confrontation was no more than a few hours. Weighing these factors against the corrupting effect of the suggestiveness of the pre-trial identification procedure itself, we conclude that there was not a substantial likelihood of

misidentification. All of Bobby Hodge's identification testimony was, therefore, properly admissible.

## III.

[12] Defendant Moore brings forward a number of additional questions. First, he assigns error to the trial court's denial of his motion to set bond. This argument is frivolous. Moore orally moved at arraignment for bond. The district attorney objected. Bond was denied when the court determined that Moore would be tried on a charge of first degree murder and that the state would seek the death penalty. Whether a defendant charged with a capital offense is entitled to a bail bond is a matter in the discretion of the trial judge. G.S. 15A-533. We find no abuse of that discretion here.

[13] Defendant Moore complains that the trial court erred in failing to allow his challenge for cause of alternate juror Locklear. In response to questions by defense counsel, Locklear stated that she was sixty-five years old, had a history of heart trouble, took medication daily for high blood pressure, and if she experienced pain or became upset she utilized nitroglycerin pills. She thought her health would allow her to sit for one day, but beyond that she was not sure, except that she felt a trial lasting more than a week would be too strenuous. In response to inquiries of the court, juror Locklear also stated that if her health did not interfere, she could render a fair and impartial verdict. The court observed that the work of a juror was not strenuous, that often veniremen with heart conditions serve on a jury, and that counsel on both sides had agreed that the trial would not last more than a week. The court then denied defendant Moore's challenge for cause of juror Locklear.

Questions concerning the competency of a juror are within the discretion of the trial judge, whose rulings thereon will not be overturned on appeal absent an abuse of discretion or error of law. *State v. Smith*, 290 N.C. 148, 155, 226 S.E. 2d 10, 15 (1976), *cert. denied*, 429 U.S. 932 (1976). Judge Smith fully questioned the juror about her health and allowed defense counsel the opportunity to do the same. No abuse of discretion has been shown. We also note that juror Locklear was ultimately removed on peremptory challenge by defendant Oliver.

By his next assignment of error, defendant Moore challenges the use of leading questions in the examination by the district

attorney of several of the state's witnesses. Defendant cites six questions asked of four different adult witnesses and two questions asked of Bobby Hodge, and argues that, cumulatively, the use of leading questions over the course of the trial was prejudicial. Objections, however, to five of the questions were sustained. As for the question asked of Bobby Hodge[9] the objection to which was overruled, we find it to be within the rules permitting some leading in the examination of young witnesses. *State v. Cobb*, 295 N.C. 1, 243 S.E. 2d 759 (1978).

Even if the question were improper we are satisfied the answer could not have prejudiced defendant.[10]

**[14]** Defendant Moore also challenges the determination by the trial court that Bobby Hodge, age seven, was a competent witness.

---

[9] "Q. All right. Did you see anything on the ground or on the pavement there under his [grandfather's] head, or not?

MR. GIBSON: Object.

THE COURT: Overruled.

This constitutes Defendant Oliver's
EXCEPTION NO. 160

THE WITNESS: No, sir.
Q. (By Mr. Britt) Did you see anything, any blood or anything?
MR. JACOBSON: Object to leading, Your Honor.
THE COURT: Overruled.

This constitutes Defendant Moore's
EXCEPTION NO. 161

THE WITNESS: I saw some blood.
Q. (By Mr. Britt) You saw what?
A. I saw blood.

This constitutes Defendant Moore's
EXCEPTION NO. 162.

I don't remember where the blood was."

It is clear that the youthful witness had indeed seen some blood. He did not recall having seen it under the head of his grandfather. Some amount of leading was an acceptable method of eliciting this fact from this witness. The matter, in any event, was of little moment.

[10] Several other witnesses testified without objection to the presence of blood under Dayton Hodge's head.

State v. Oliver

There is no fixed age below which one is incompetent as a matter of law to testify. *State v. Cooke*, 278 N.C. 288, 179 S.E. 2d 365 (1971). The test of competency of a child as a witness is the capacity of the child to understand and to relate, under the solemn obligation of an oath, facts which will assist the jury in reaching its decision. *State v. Turner*, 268 N.C. 225, 150 S.E. 2d 406 (1966). The determination of a child's competency to testify rests in the sound discretion of the trial judge. *State v. Cooke*, 280 N.C. 642, 187 S.E. 2d 104 (1972). Judge Smith conducted an extensive *voir dire* of Bobby Hodge to determine his competency. Bobby testified that he knew the importance of telling the truth, knew the difference between truth and falsehood, and intended to tell the truth. The trial court's conclusion that the witness was competent was well within the boundaries of sound discretion.

Defendant Moore raises the additional objection that Bobby's answers on *voir dire* were in response to leading questions of the prosecutor. The rule allowing some leading in examining a child on direct examination applies with equal force to the *voir dire* examination of a child. Absent an abuse of discretion resulting in actual prejudice to a defendant, a decision by the trial judge to allow some leading of a youthful witness is not subject to reversal on appeal. Defendant Moore makes no showing of abuse or prejudice; his assignment of error is without merit.

**[15]** Defendant Moore next charges the trial court with error in allowing the district attorney to offer into evidence what defendant describes as incompetent and prejudicial matter for the sole purpose of inflaming the jury. Defendant complains of a portion of the testimony of Minnie Waddell, Elbert Ford, and Robert Vereen. Minnie Waddell testified, in part, that she had seen Moore and Oliver together "at different times" prior to 12 December 1978. Elbert Ford testified that on 12 December 1978 at approximately 9:00 a.m. he observed "two boys walking down south toward Watts' store." The following then occurred:

"Q. All right. Do you know what color these people were?
A. Well, no, I don't, but they were dark people. I don't know what color they were.

Q. All right.
MR. JACOBSON: Move to strike.

THE COURT: Denied.

This constitutes Defendant Moore's
EXCEPTION NO. 141"

Robert Vereen was permitted to testify that he had seen the defend-
ant Moore in Vereen's father's store on 11 December 1978 and to
give a description of defendant Moore's clothing at that time.

Regarding Minnie Waddell's testimony defendant's objection
to it was sustained, his motion to strike was allowed, and the jury
was instructed to disregard it. Elbert Ford's testimony as to what
he observed shortly before the incident under investigation was
admissible. As to Robert Vereen's testimony, to the extent that his
description of defendant Moore's clothing on the day before the
shootings matched descriptions given of defendant's clothing on the
day of the shooting, his testimony is admissible. Even if we assume,
for the purpose of argument, error in the admission of Ford's and
Vereen's testimony, we fail to see how such testimony was offered
for the purpose of inflaming the jury or how it could have had such
an effect. Its admission would be, at most, harmless error. *See* 1
Stansbury's North Carolina Evidence § 77 (Brandis rev. 1973).

[16]  Defendant Moore further objects to certain cross-examina-
tion by the district attorney of defense witness Robert Brown claim-
ing that it exceeded the boundaries of "appropriate" cross-examina-
tion. Brown testified on direct that he had met defendant Moore in
jail where they became cell mates for two months. During this time
he overheard defendant Moore say that on the day of the murders
Moore was trying to fix his truck in the vicinity of Watts' store. He
went into the woods to relieve himself and the "next thing he know,
'Boom,' police." Brown testified further that defendant Moore had
never told him that he, Moore, had killed Allen Watts. On cross-
examination the district attorney was permitted to ask, "Brown,
you will do anything to cover up for your old friend, won't you?"
Again, the district attorney was permitted to ask, "Were you cover-
ing up for your old buddy and cell mate sitting over there at the next
table?" These questions were permissible cross-examination. They
were designed to show, if they could, bias and prejudice on the part
of the witness. This is a proper function of cross-examination.

On another occasion the district attorney was permitted to ask
the witness Brown whether he was tried and convicted in Robeson

County for armed robbery. The witness replied that he was "tried and railroaded, yeah, in this courthouse." The district attorney was then permitted to ask the witness, over defendant Moore's objection, if he had testified in the case against him. The witness replied that he had. Whether the witness had testified in his own case was not a proper subject for cross-examination in the case against defendant Moore. The fact that he testified or did not testify in no way bears on his credibility nor does it tend to impeach him as a witness. The inquiry, in short, was irrelevant. Even so, we are satisfied the result of the trial would not have been different had this incident not occurred; therefore defendant was not prejudiced by this aspect of the district attorney's cross-examination.

[17] Defendant Moore challenges the admission of certain evidence offered by the state on the ground the state failed to show that the items in question had undergone no material change in their condition since the incident occurred and on the further ground, as to some of the items, of irrelevancy. The items offered by the state were: two "football candies," a *Robesonian* newspaper, a plastic bag of paper money and food stamps, a blue coat with a fur lined collar, two toboggans, several pieces of multi-colored Christmas wrappings, a red pullover shirt with a hood, and a pistol and bullets. State's witness Lee Sampson, an SBI agent specializing in crime scene investigations, identified the "football candies" and the *Robesonian* newspaper as having been recovered by him from the counter at Watts' store on 12 December 1978. He identified the coat and two toboggans as having been recovered from the truck used by defendants on the day of the crimes. He identified the multi-colored Christmas wrappings matching that on the "football candies" as having come from the right coat pocket of the coat found in the truck. He identified the red pullover shirt with a hood as being the shirt which defendant Moore was wearing when the witness observed him at the Sheriff's Department in Lumberton on the day of the shootings. He identified the pistols and shells as having been recovered by him and other investigators on 30 April 1979 in the area where defendants had been earlier apprehended. He identified the plastic bag of paper money and food stamps as having been given to him by Deputy Ernest Chavis on the day of the shootings. Chavis had earlier testified that he had taken the plastic bag from a ditch near the place where and at the time when defendants were apprehended. He gave the bag, in turn, to Lee Sampson.

The rules governing the admission of this kind of physical evidence, sometimes denoted "real evidence," were well set out by Justice Huskins, writing for the Court in *State v. Harbison*, 293 N.C. 474, 483-84, 238 S.E. 2d 449, 454 (1977):

"Objects offered as having played an actual direct role in the incident giving rise to the trial are denoted 'real evidence.' McCormick, Evidence § 212 (2d ed. 1972); 1 Stansbury's North Carolina Evidence § 117, n. 1 (Brandis rev. 1973). Such evidence must be identified as the same object involved in the incident in order to be admissible. *State v. Winford*, 279 N.C. 58, 181 S.E. 2d 423 (1971). It must also be shown that since the incident in which it was involved the object has undergone no material change in its condition. *See* McCormick, *supra*, § 212, p. 527. *See also Hunt v. Wooten*, 238 N.C. 42, 76 S.E. 2d 326 (1953). According to Professor Stansbury, when a tangible object is offered it must be first authenticated or identified, 'and this can be done only by calling a witness, presenting the exhibit to him and asking him if he recognizes it and, if so, what it is.' 1 Stansbury's North Carolina Evidence § 26 (Brandis rev. 1973).

"There are no simple standards for determining whether an object sought to be offered in evidence has been sufficiently identified as being the same object involved in the incident giving rise to the trial and shown to have been unchanged in any material respect. 'No specific rules have grown up about the authentication of chattels, chiefly because the variety of circumstances involved are so great that no specific rules would be suitable.' 7 Wigmore, Evidence § 2129, at 569 (3d ed. 1940). Consequently, the trial judge possesses and must exercise a sound discretion in determining the standard of certainty required to show that the object offered is the same as the object involved in the incident giving rise to the trial and that the object is in an unchanged condition. McCormick, *supra* § 212, p. 527, at nn. 25-27. *See, e.g., Walker v. Firestone Tire and Rubber Co.*, 412 F. 2d 60 (2d Cir. 1969)."

In *Harbison* we held that a tire with bullet holes in it was properly excluded from evidence when defendant, who sought to offer it,

State v. Oliver

offered no evidence of the tire's unchanged condition in the pres-
ence of evidence that there were no bullet holes in the tire at the
time of the incident under investigation.

   In the case at bar there is no evidence that the condition of any
of the items in question had changed between the time of their
recovery on the day of the shootings and the time of trial. Indeed the
very nature of the items themselves would make a change in condi-
tion extremely unlikely in the short time between the crimes' com-
mission and the trial. All the items were positively identified as
being the very items recovered by those investigating the incident
in question. Considering the nature of the items themselves and the
absence of any suggestion that they had undergone some relevant
change between the time of their recovery and the time of trial, we
conclude that the failure of the state to offer positive testimony that
the objects had undergone no material change was not fatal to their
admission. That they had in fact undergone no material change is
clearly implied in the testimony of Sampson. His failure expressly
to so state does not so detract from his otherwise positive identifica-
tion of the items so as to render them inadmissible.

[18] Defendant argues that the "football candies," the "football
candy wrappers" and the toboggan [11] were irrelevant inasmuch as
there was no showing that they played any part in the incident
whatsoever. Although it is not entirely clear from the record, it
appears reasonably certain that the football candy wrappers found
in the pocket of the jacket which was, in turn, found in the truck
defendants used, matched in appearance the wrappers on the foot-
ball candy found in Watts' store. This evidence was clearly relevant
as a circumstance tending to show that defendants had, at some-
time, been in the store. The dark toboggan, also found in the truck,
was relevant inasmuch as one witness observed Moore wearing a
dark toboggan shortly after the crimes were committed. This
assignment of error is, consequently, overruled.

[19] Defendant Moore assigns as error the failure of the trial judge
to instruct as to him on the offenses of accessory before and accessory
after the fact to the crimes of armed robbery and murder. This
assignment is frivolous. Suffice it to say there is no evidence that
Moore was either an accessory before or an accessory after the fact.
The thrust of all the state's evidence is that he was a principal

_____
[11] Only the dark toboggan was actually offered in evidence.

perpetrator of all crimes committed either because he was an aider and abettor or because he and Oliver were acting in concert in the commission of these crimes. Defendant Moore's brief accurately summarizes the state's evidence and, itself, demonstrates that Moore is guilty, if at all, as a principal perpetrator. Moore says the state's evidence tended to show:

> "The two Defendants went into [Watts'] store and purchased several items. Allen Watts was in the store behind the counter. Several other people were in the store who made purchases and then left. Dayton Hodge and his grandson, Bobby Lynn Hodge, pulled up to the gas pumps out in front of the store and Mr. Hodge proceeded to pump gas into his pickup truck. The Defendants shot and killed Allen Watts, removed money and food stamps from the cash register placing it in a brown paper sack, and ran outside where Defendant, J. W. Oliver, shot and killed Dayton Hodge. The Defendants then ran north on Highway 41-Bypass and turned into the woods about 300 feet north of Allen Watts' convenience store. The two Defendants continued through the woods and across North Carolina Highway No. 130 to the brown and white pickup truck which was parked at the Square Deal Warehouse. The truck would not start and the Defendants then ran into the woods behind the Square Deal Oliver shoot his grandfather, Dayton Hodge. The Defendants were apprehended in the woods behind the Square Deal Warehouse at approximately 10:15 a.m. by Deputies Bruce Bullock and B. C. Bass. A brown paper bag containing money and food stamps was found in a ditch near where the Defendant Moore was apprehended."

In addition, the State's evidence also tended to show that both defendants had reconnoitered Watts' store before the crimes. On the morning of the crimes defendants were seen riding together in Oliver's truck. Defendants were seen together inside the store shortly before the killings occurred. Immediately after the shootings both defendants were seen to run into the woods near Watts' store. Both defendants were arrested together.

An accessory before the fact is one who is *absent* from the scene of the crime but who counseled, procured, or commanded its com-

mission. *State v. Small*, 301 N.C. 407, 272 S.E. 2d 128 (filed 2 December 1980, No. 101, Fall Term 1980); *State v. Squire*, 292 N.C. 494, 234 S.E. 2d 563 (1977), *cert. denied*, 434 U.S. 998 (1977); *State v. Benton*, 276 N.C. 641, 174 S.E. 2d 793 (1970). An accessory after the fact is one who, knowing that a felony has been committed by another, receives, relieves, comforts or assists such felon, or who in any manner aids him to escape arrest or punishment. *State v. Squire, supra; State v. McIntosh*, 260 N.C. 749, 133 S.E. 2d 652 (1963). [12]

There is no evidence here that Moore was an accessory. The evidence shows that both defendants were present at the scene and were acting together in the commission of the armed robbery. The murders occurred in furtherance of their common purpose to commit this crime or as a natural consequence thereof. Where two or more persons "join in a purpose to commit a crime, each of them, *if actually or constructively present*, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof." *State v. Westbrook*, 279 N.C. 18, 41-42, 181 S.E. 2d 572, 586 (1971), *death sentence vacated*, 408 U.S. 939 (1972) (emphasis supplied); *accord, State v. Lovelace*, 272 N.C. 496, 158 S.E. 2d 624 (1968). There was, consequently, no error in the trial judge's failing to submit the offenses of accessory before or accessory after the fact in the cases against defendant Moore.

## IV.

We turn now to the sentencing phase of the case.

The jury found both defendants guilty of first degree murder of Allen Watts, first degree murder of Dayton Hodge, and armed robbery of Watts. The verdicts were returned on Monday, 22 May 1979.

---

[12] An additional reason for not submitting accessory after the fact as an alternative verdict is that one may not be convicted of the crime of accessory after the fact upon an indictment charging him as a principal perpetrator. *State v. McIntosh, supra; State v. Jones*, 254 N.C. 450, 119 S.E. 2d 213 (1961). At the time of defendants' trial here, one could have convicted of an accessory before the fact on an indictment charging him as a principal perpetrator. *State v. Holmes*, 296 N.C. 47, 249 S.E. 2d 380 (1978). Effective 1 October 1979, however, newly enacted G.S. 14-5.1 provides that one indicted as a principal perpetrator may not be convicted on that indictment as an accessory before the fact. 1979 Sess. Laws, Chapter 811.

State v. Oliver

The following day Judge Smith convened the sentencing phase of the proceeding before the same jury which had heard the guilt phase. Correctly taking the position that inasmuch as the state bore the burden of proof in the sentencing phase it should first go forward with its evidence, Judge Smith asked the state to proceed. The state announced that it had no additional evidence on the sentencing phase. Defendant Moore then offered evidence as follows: On 12 December 1978, the date of the crimes charged, he was 19 years, 11 months old. Defendant Oliver offered evidence tending to show that at the time of trial he was 28 years old, had finished the 11th grade in school, had since been working steadily, attends church, and had a good character and reputation in the community where he lived. Defendant Oliver's character witnesses, his sister and a friend of the family, conceded on cross-examination that Oliver had been convicted twice in 1978 for breaking and entering and larceny. His sister further admitted that he had spent some time in a South Carolina prison.

In the absence of the jury there was considerable discussion between the court and counsel as to the propriety of the state's offering into evidence a particular document referred to as an "FBI check" showing that Moore had a prior criminal record. Ultimately Moore and the state stipulated that the state could read from the document only those offenses of which Moore had in fact been finally convicted. Moore waived all objections to the form by which the evidence would be admitted but reserved his objections to the "relevancy and competency" of the evidence. Portions of this document were then read to the jury pursuant to the stipulation. This evidence showed that Moore had been convicted in Columbus County of trespass twice, "felonious breaking and entering and felonious larceny," "damage to real property," and "larceny" twice.

After the jury heard arguments and the court's instructions on the question of sentence, the jury returned verdicts recommending sentences. As to defendant Oliver the jury recommended that he be given the death penalty in both murder cases. As to defendant Moore the jury recommended that he be sentenced to death for the murder of Allen Watts and to life imprisonment for the murder of Dayton Hodge.

Judge Smith submitted aggravating and mitigating circumstances together with the other questions required by G.S. 15A-2000 separately as to each defendant and, again, as to each murder.

Four sets of issues, one in each of the four murder cases, were thus submitted. Identical aggravating and mitigating circumstances, however, were submitted in all four cases, except that as to Moore the jury was permitted to find his age as a mitigating circumstance. The jury answered all issues identically in all four cases except that as to Moore in the Hodge murder case it concluded that this murder was actually committed by defendant Oliver and that Moore was only an accomplice whose "participation was relatively minor." *See* G.S. 15A-2000(f)(4).

Thus in all four murder cases the jury found beyond a reasonable doubt the existence of the following aggravating circumstances: (1) the murders were committed while defendants were "*engaged* in the commission of or a flight after committing the felony of robbery with a dangerous weapon" (emphasis supplied); (2) the murders were committed while defendants were "*aiders and abettors* in the commission of or flight after committing the felony of robbery with a dangerous weapon" (emphasis supplied); (3) the murders were committed "for pecuniary gain"; (4) the murders were "especially heinous, atrocious or cruel." *See* G.S. 15A-2000(e) (5), (6), and (9). In all four cases the jury found beyond a reasonable doubt that the aggravating circumstances were "sufficiently substantial to call for the imposition of the death penalty." *See* G.S. 15A-2000(c)(2). In all four cases the jury failed to find as mitigating circumstances that the defendants had "no significant history of prior criminal activity" and failed to find "any other circumstance arising from the evidence which it deemed to have mitigating value." *See* G.S. 15A-2000(f)(1) and (9). It also failed to find the age of Moore to be a mitigating circumstance. *See* G.S. 15A-2000(f)(7). As to defendant Oliver it failed to find he was only an accomplice in or accessory to the murders such that his participation "was relatively minor." *See* G.S. 15A-2000(f)(4). It likewise failed to find this to be a mitigating circumstance with regard to defendant Moore in the Watts' murder case. In all four cases the jury found beyond a reasonable doubt that the mitigating circumstances were insufficient to outweigh the aggravating circumstances.[13] *See* G.S. 15A-2000(c)(3).

---

[13] Notwithstanding this last finding the jury recommended that defendant Moore be sentenced to life imprisonment for the murder of Dayton Hodge apparently on the basis of its earlier finding that his participation in this murder "was relatively minor."

**[20]** Both defendants assign as error the submission of that aggravating circumstance defined by G.S. 15A-2000(e)(5), *i.e.*, that the murders were committed while defendants were "engaged, or [were] aider[s] or abettor[s] in the commission of . . . or flight after committing . . . robbery." We agree that it was prejudicial error to submit this aggravating circumstance; therefore defendant Oliver is entitled to a new sentencing hearing in both the Watts and Hodge murder cases and defendant Moore is entitled to a new sentencing hearing in the Watts' case.

When a defendant is convicted of the capital offense of first degree murder on the theory of felony murder, it is error to submit the underlying felony to the jury in the sentencing phase of the trial as an aggravating circumstance. *State v. Cherry, supra,* 298 N.C. 86, 257 S.E. 2d 551. Here both defendants were convicted of both murders solely on a felony murder theory. Thus it was error to submit the first two aggravating circumstances in the three cases in which the death penalty was imposed.

The state concedes the error. It argues, however, that it was not prejudicial. Under circumstances similar to those in this case we concluded in *Cherry* that the error was prejudicial. We said in *Cherry, id.* at 114, 257 S.E. 2d at 568:

> "We are unable to say that under the circumstances of this particular case the trial judge's submission of the issue concerning the underlying felony constituted harmless error. Had the jury not considered the underlying felony as an aggravating circumstance, it may well have decided that the remaining aggravating circumstances were not sufficiently substantial to call for imposition of the death penalty."

So it is here. As in *Cherry* both these murders were committed in the course of an armed robbery which constituted the underlying felony giving rise to the convictions of first degree murder in all four cases. The jury found only two other aggravating circumstances, *i.e.*, that the murders were committed for pecuniary gain and were especially heinous, atrocious, or cruel. In *Cherry* the jury likewise found that the murder was committed for pecuniary gain.[14]

---

[14] The jury in *Cherry* failed, however, to find that the murder was especially heinous, atrocious, or cruel.

An error, other than one of constitutional dimensions, is prejudicial "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial . . . ." G.S. 15A-1443(a). We are unable to say, under the circumstances of this case, that had the first two aggravating circumstances not been submitted there is no reasonable possibility that a different result might have been reached on the sentencing phase of these proceedings. This is so because two out of four aggravating circumstances would have been eliminated. These two circumstances related to the underlying felony of armed robbery. The jury might well have concluded that these were the most serious of all the aggravating circumstances it was permitted to consider. This is particulary true in the Hodge murder cases in which we conclude below that circumstance number four, *i.e.*, the murder was "especially heinous, atrocious, or cruel" should not have been submitted.

**[21]** Defendants next contend that aggravating circumstance number four, *i.e.*, that the murders were "especially heinous, atrocious, or cruel" should not have been submitted. We conclude that this circumstance was properly submitted in the Watts, but not in the Hodge, murder case.

The meaning of this aggravating circumstance was fully considered in *State v. Goodman,* 298 N.C. 1, 24-26, 257 S.E. 2d 569, 585 (1979), where he said:

"While we recognize that every murder is, at least arguably, heinous, atrocious, and cruel, we do not believe that this subsection is intended to apply to every homicide. by using the word 'especially' the legislature indicated that there must be evidence that the brutality involved in the murder in question must exceed that normally present in any killing before the jury would be instructed upon this subsection."

In *Goodman* we adopted the Florida and Nebraska view that for this aggravating circumstance to apply the murder must be a "conscienceless or pitiless crime which is unnecessarily torturous to the victim," and we approved the following jury instruction:

"You are instructed that the words 'especially heinous,

> atrocious or cruel' means extremely or especially or par-
> ticulary heinous or atrocious or cruel. You're instructed
> that 'heinous' means extremely wicked or shockingly
> evil. 'Atrocious' means marked by or given to extreme
> wickedness, brutality or cruelty, marked by extreme vio-
> lence or savagely fierce. It means outrageously wicked
> and vile. 'Cruel' means designed to inflict a high degree of
> pain, utterly indifferent to or enjoyment of the suffering
> of others."

We noted in *Goodman* that by so limiting the application of this
aggravating circumstance it would not become "a catch all provi-
sion which can always be employed in cases where there is no
evidence of other aggravating circumstances." *Id.* at 26, 257 S.E. 2d
at 585.

Several cases have concluded that certain kinds of murders
could be "especially heinous." In *Goodman* the deceased was shot
several times, cut repeatedly with a knife, placed in the trunk of a
car where he remained alive for several hours and where his strug-
gles to escape could be heard by his assailants who drove him to
another county, took him from the car, placed him on the ground
and shot him twice through the head. We concluded this murder
was "marked by extremely vicious brutality" calling for the appli-
cation, if the jury so found, of the "heinous, atrocious, or cruel"
aggravating circumstance. We held in *State v. Johnson*, 298 N.C.
47, 257 S.E. 2d 597 (1979) that submission of this aggravating cir-
cumstance was proper where the defendant tried to strangle his
victim to death and, upon rendering her unconscious, sexually
molested her when, realizing she was not dead, then stabbed her
until she died. A number of decisions from other jurisdictions have
had occasion to consider whether particular murders could be "es-
pecially heinous, atrocious, or cruel" under capital sentencing stat-
utes similar to ours. At least one court has determined that the
murder of one pleading for mercy may fall within the category of an
"especially heinous" offense. *Lucas v. State*, 376 So. 2d 1149 (Fla.
(1979).[15]

On the other hand in *State v. Cherry, supra,* where the de-

---

[15]There is a good discussion of all these cases and their holdings in *Vague and Overlapping Guidelines: A Study of North Carolina's Capital Sentencing Statute*, 16 Wake Forest L. Rev. 765, 796-800 (1980).

ceased was shot by defendant during the course of an armed robbery under circumstances indicating that the shooting may not have been intentional, although defendant was threatening the deceased and others with his pistol at the time, the jury failed to find that the killing was especially heinous. This Court consequently had no occasion to consider whether that particular aggravating circumstance should have been submitted.

In the Watts murder cases the state's evidence shows that Watts, after opening his cash register in response to defendants' demands, begged for his life. Watts said, "Please don't shoot me. Go ahead and take the money." With Watts pleading for his life defendant Moore, according to his evidence, mercilessly shot him to death. In our view the jury could find from these circumstances that the murder of Watts was especially heinous, atrocious or cruel. This aggravating circumstance was appropriately submitted in the Watts cases. In the Hodge cases, however, the state's evidence tends to show that defendant Oliver, as he was running from the store, shot and killed Hodge who had pulled up to purchase gas. Although Hodge was an innocent bystander, his murder by defendant Oliver was, according to the evidence, the product of a sudden act, and death apparently was instantaneous. There was no unusual infliction of pain or suffering on the victim. The shooting was undoubtedly the result of Oliver's excitement and haste in his attempt to escape from crimes he had already committed. We can find nothing in the brutality of this killing which exceeds that normally present in a case of first degree murder.

Where it is doubtful whether a particular aggravating circumstance should be submitted, the doubt should be resolved in favor of defendant. When "a person's life is at stake . . . the jury should not be instructed upon one of the [aggravating] statutory circumstances in a doubtful case." *State v. Goodman, supra,* 298 N.C. at 30, 257 S.E. 2d at 588. We conclude, therefore, that the "especially heinous" aggravating circumstance should not have been submitted in the Hodge murder cases.

[22] Defendant Moore assigns as error permitting certain portions of his criminal record to be read to the jury. The assignment is without merit. Defendant Moore stipulated the use of this method in getting the evidence before the jury. He objected only to its "relevancy and competency." The evidence was relevant and competent to negate the fact that defendant had no significant history of prior

criminal activity which was submitted to the jury on his behalf as a possible mitigating circumstance.

[23] Defendant Moore further objects to the submission of the aggravating circumstance in the Hodge murder cases that the murder was committed "for pecuniary gain." Moore argues that since the evidence showed the money had already been obtained from Allen Watts, there is no evidence that Hodge was murdered "for pecuniary gain." While the argument is plausible we reject it. The hope of pecuniary gain provided the impetus for the murder of both Watts and Hodge. This hope and the murders were inextricably intertwined. The murder of Hodge was apparently committed in an effort to eliminate a witness to the robbery; and the murder of Watts, in the hope that defendants could successfully escape, avoid prosecution, and enjoy the fruits of their sordid endeavor. The evidence is such that the jury could find that both murders were committed for the purpose of permitting defendants to enjoy pecuniary gain.

[24] Neither is there any error in submitting this circumstance in a felony murder case in which the underlying felony is robbery notwithstanding the rule that the robbery itself cannot be submitted as such a circumstance. The robbery constitutes an essential element of felony murder. In a capital case tried solely on a felony murder theory a jury, in the absence of this element, could not find defendant guilty of the capital offense.[16] The circumstance that the capital felony was committed for pecuniary gain, however, is not such an essential element. This circumstance examines the motive of the defendant rather than his acts. While his motive does not constitute an element of the offense, it is appropriate for it to be considered on the question of his sentence. In *Cherry* the murder was committed during the course of the robbery of a convenience store. The aggravating circumstance of "pecuniary gain" was submitted and answered by the jury against the defendant. Although we remanded the case for a new sentencing hearing, we did not suggest in *Cherry* that this particular aggravating circumstance should not be submitted at the new hearing. We reject the position taken by the Nebraska Court that this aggravating circumstance does not apply to a murder committed during a robbery. *See State v. Rust,* 197 Neb.

---

[16] The underlying felony is merged into and forms a part of the capital offense and may not be considered again as a circumstance which aggravates that offense.

State v. Oliver

528, 250 N.W. 2d 867 (1977). This aggravating circumstance, we hold, was properly submitted to the jury in both murder cases.

Defendant Moore objects to the order in which the issues were submitted in the sentencing hearing.[17] Suffice it to say that the order in which the issues were presented follows the order suggested by G.S. 15A-2000(c). While there is some logic in the order suggested by defendant, see n. 17, we find no error in the order in which the issues were submitted.

Other errors in the sentencing phase suggested by defendants are not likely to arise at the new hearing.

---

[17] The record shows that issues were submitted in all four murder cases as follows:

"ISSUE ONE: Do you unanimously find from the evidence beyond a reasonable doubt that one or more of the following aggravating circumstances existed at the time of the commission of the murder of [Allen Watts or Dayton Hodge] . . . ?

ISSUE TWO: Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances in the murder of [Allen Watts or Dayton Hodge] found by you are sufficiently substantial to call for the imposition of the death penalty as to [George Moore, Jr., or John Oliver] . . . ?

ISSUE THREE: Do you find one or more mitigating circumstances as to [George Moore, Jr., or John Oliver] . . . ?

ISSUE FOUR: Do you unanimously find beyond a reasonable doubt that the mitigating circumstances are insufficient to outweigh the aggravating circumstances?"

Defendant Moore suggests that a preferable order would be:

"ISSUE ONE: Do you unanimously find from the evidence beyond a reasonable doubt that one or more of the following aggravating circumstances existed at the time of the commission of the murder of [Allen R. Watts or Dayton Hodge] . . . ?

ISSUE TWO: Do you find one or more mitigating circumstances as to George Moore, Jr . . . ?

ISSUE THREE: Do you unanimously find beyond a reasonable doubt that the mitigating circumstances are insufficient to outweigh the aggravating circumstances . . . ?

ISSUE FOUR: Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances in the murder of [Allen R. Watts or Dayton Hodge] found by you are sufficiently substantial to call for the imposition of the death penalty as to George Moore, Jr. . . . ?"

## CONCLUSION

The result is this: We find no error in the convictions of both defendants for armed robbery and two counts of murder in the first degree. For error, however, in the sentencing phase of both the Hodge and the Watts murder cases as to defendant Oliver and the Watts murder case as to defendant Moore we remand these cases for a new sentencing hearing to be conducted in a manner not inconsistent with this opinion.

NO ERROR in Cases Nos. 78-CRS-25574 and 78-CRS-25579 (the armed robbery cases)

NO ERROR in the convictions in Cases Nos. 78-CRS-25575, 78-CRS-25576, 78-CRS-25577, and 78-CRS-25578 (the murder cases)

REMANDED FOR NEW SENTENCING HEARING in Cases Nos. 78-CRS-25575, 78-CRS-25576, and 78-CRS-25578 (the murder cases in which defendants were sentenced to death)

Justice MEYER did not participate in the consideration and decision of this case.