STATE OF NORTH CAROLINA v. DONALD WAYNE DELLINGER

No. 430A82

(Filed 3 May 1983)

**1. Criminal Law § 158— record on appeal—duty of appellant—conclusiveness**

It is the duty of the appellant to see that the record on appeal is properly made up and transmitted. Moreover, the record imports verity and the court is bound on appeal by the record as certified.

State v. Dellinger

2. **Criminal Law § 91— statutory speedy trial—exclusion of time pending motion for change of venue**

   The period of time between the filing of defendant's motion for a change of venue and its determination 115 days later was properly excluded in computing the statutory speedy trial period. G.S. 15A-701(a1) and (b).

3. **Criminal Law § 15.1— pretrial publicity—denial of change of venue**

   The trial court did not abuse its discretion in the denial of defendant's motion for a change of venue because of pretrial publicity where defendant relied on two newspaper articles and one television newscast which occurred some six months prior to the trial and which were substantially factual and not inflammatory, and where there was no showing that any juror had even read the newspaper articles or heard the broadcast. G.S. 15A-957.

4. **Criminal Law § 42.6— rifle bolt—no necessity to show chain of custody**

   A rifle bolt found near a murder victim's body was not inadmissible because the State failed to show a proper chain of custody where the bolt's significance was its location near the victim's body, not characteristics intrinsic to the bolt itself; the bolt's location had already been well established, without objection by defendant, by an officer's description of its location illustrated by photographs taken at the crime scene; and the bolt was sufficiently identified by the officer as being the one he observed at the scene so that a chain of custody foundation was not in any event required for its admission.

5. **Grand Jury § 2; Indictment and Warrant § 4— testimony about appearance before grand jury—mistrial properly denied**

   The trial court did not err in failing to declare a mistrial because of an officer's testimony with respect to his appearance before the grand jury where the sole purpose of the testimony was to establish the date thereof and to show that a State's witness was the first person arrested for the murder in question, and the officer said nothing about his testimony before or any other "proceedings" of the grand jury which must under G.S. 15A-236(e) be kept secret.

6. **Criminal Law § 89— credibility of witness—absence of criminal record—direct examination**

   The party calling a witness may enhance the credibility of the witness by showing on direct examination of the witness that he has no criminal record or that his criminal record is relatively insignificant.

7. **Criminal Law § 169— failure to object to evidence—similar evidence admitted without objection**

   Defendant cannot complain of a witness's negative response to a question as to whether he had ever been convicted of any crimes of violence where he did not object to the question, and where any objection would have been waived by defendant's own extensive cross-examination of the witness about his prior criminal record and other specific acts of misconduct. App. R. 10(b)(1).

8. **Criminal Law § 87.1— leading question on voir dire—absence of prejudice**

   Defendant was not prejudiced by a leading question asked a witness on voir dire as to whether the reason he could not pick defendant out from

photographs was because defendant had long hair and a beard in the photographs where the witness had previously stated on cross-examination that he could not identify defendant from the photographs because "he had the long hair and beard."

**9. Criminal Law § 34.7— commission of other offense—admissibility to show intent**

Testimony by a witness in a first degree murder case that while she and defendant were facing a mirror in a motel room on the day after the crime, defendant said, "I done killed one damn man and I will blow your damn head off," and that defendant then shot the mirror and "blew it all to pieces" was admissible to show defendant's *quo animo, i.e.*, that defendant intentionally and with malice killed the victim, even though it tended to show defendant's commission of another offense.

Justice FRYE did not participate in the consideration or decision of this case.

BEFORE *Judge Clifton E. Johnson,* presiding at the 15 February 1982 Criminal Session of CATAWBA Superior Court, and a jury, defendant was found guilty of first degree murder. He was sentenced to life imprisonment[1] and appeals of right pursuant to G.S. 7A-27(a).

*Rufus L. Edmisten, Attorney General, by Charles M. Hensey, Assistant Attorney General, for the state.*

*Rudisill & Brackett, P.A., by J. Steven Brackett, for defendant appellant.*

EXUM, Justice.

In this appeal defendant's assignments of error relate to the Speedy Trial Act, a motion for change of venue, admission of evidence and sufficiency of the evidence. We find no merit in any of the assignments and uphold the judgment of the trial court.

The state's evidence tends to show:

---

1. The murder for which defendant was indicted and convicted occurred in January 1970. North Carolina's capital punishment statute applicable at that time was thereafter rendered constitutionally suspect by the United States Supreme Court's decision in *Furman v. Georgia,* 408 U.S. 238 (1972), and declared inapplicable to offenses committed before 18 January 1973 in *State v. Waddell,* 282 N.C. 431, 446-47, 194 S.E. 2d 19, 29-30 (1973). Thus, defendant was not subject to the death penalty in this case.

On 22 January 1970 the victim, John LaFayette Marlowe, age 69, was living alone in a house in a rural section of Catawba County. In the early evening of that day he left a friend's garage, intending to go to his home several hundred feet away. Early the next morning, Marlowe's dead body was found in a cornfield near his house. Multiple head injuries caused his death.

On 17 August 1981, Fred Clifford Sigmon, who had been charged with Marlowe's murder, entered into a plea bargain with the state and agreed to testify with respect to the murder. Defendant was thereafter indicted, and at his trial Sigmon testified as follows: He became acquainted with defendant two or three weeks before 22 January 1970. They began drinking together. Sigmon heard that Marlowe had a large sum of money. Sigmon and defendant decided to rob Marlowe, but defendant promised there would be no violence. Soon after dark on 22 January 1970 they went to Marlowe's home. No one was there. They entered the house but could not find any money. Defendant left the house before Sigmon. When Sigmon left the house defendant "had that man [Marlowe] on the ground beating the hell out of him." Defendant struck Marlowe on his head a number of times with a gun. When Sigmon asked defendant to stop beating Marlowe, defendant threatened to kill Sigmon. After defendant stopped beating Marlowe, defendant and Sigmon went to Hickory. Defendant gave Sigmon $250 or $260 of the $600 defendant said he took from Marlowe.

Defendant offered no evidence.

I.

Defendant's assignments of error one, two, five and six relate to defendant's contentions that the state failed to comply with the Speedy Trial Act, codified in article 35 of Chapter 15A of the General Statutes. G.S. 15A-701(a1) provides in pertinent part:

> (T)he trial of a defendant charged with a criminal offense who is arrested, served with criminal process, waives an indictment or is indicted, on or after October 1, 1978, and before October 1, 1983, shall begin within the time limits specified below:
>
> > (1) Within 120 days from the date the defendant is arrested, served with criminal process, waives an indictment, or is indicted, whichever occurs last . . . .

G.S. 15A-701(b) provides in pertinent part:

> The following periods shall be excluded in computing the time within which the trial of a criminal offense must begin:
>
> (1) Any period of delay resulting from other proceedings concerning the defendant including, but not limited to, delays resulting from:
>
>    . . . .
>
>    d. Hearings on any pretrial motions or the granting or denial of such motions.
>
>    The period of delay under this subdivision must include all delay from the time a motion or other event occurs that begins the delay until the time a judge makes a final ruling on the motion or the event causing the delay is finally resolved. . . .

Defendant was indicted on 31 August 1981. On the same day defendant, then an inmate at the Federal Correctional Center in Butner, N. C.,[2] pursuant to the Interstate Agreement on Detainers Act, G.S. 15A-761 to -767, filed a written request for final disposition of the charges against him relating to Marlowe's murder. According to Judge Johnson's 11 January 1982 order, discussed below, on 2 September 1981 the district attorney began proceedings to have defendant delivered temporarily to this state's custody for trial.[3] Defendant invoked his thirty-day waiting period under the detainer statutes, and on 18 September 1981 he began to file numerous motions. He made motions for a writ of coram nobis, for a change of venue, to dismiss the indictment on various grounds, and for discovery. He filed his motion for change of venue, based on allegations of prejudicial pretrial publicity, on 18 September 1981.

On 22 October 1981 federal authorities offered temporary custody of defendant to the state, and on 15 December 1981 the

2. Defendant was serving a twenty-year sentence following his conviction in United States District Court in 1970 of bank robbery.

3. The record does not indicate what these proceedings were. Perhaps the district attorney used the procedure prescribed by G.S. 15A-771, a statute captioned, "Securing attendance of defendants confined in federal prison."

Catawba County Sheriff took physical custody of him. On 16 December 1981 defendant appeared before Judge Mills in superior court and Mr. Brackett was appointed to represent him. Judge Mills considered what times might be excludable under the Speedy Trial Act, but no order by Judge Mills relating to the Speedy Trial Act appears in the record on appeal.[4] Judge Mills continued the case until 11 January 1982.

On 11 January 1982 defendant's pretrial motions and the state's motion to exclude time from the 120-day Speedy Trial Act provision came on for hearing before Judge Johnson. Judge Johnson denied defendant's motions for change of venue, to dismiss the indictment, and for coram nobis, and allowed defendant's motions to proceed as an indigent, for a bill of particulars, and for discovery. Judge Johnson allowed the state's motion to exclude, among other periods, the time between the filing of defendant's motion for change of venue on 18 September 1981 and its determination on 11 January 1982, and he continued the trial to 18 January 1982.

The case could not be reached for trial at the 18 January 1982 session due to the trial of other cases and the district attorney moved for a continuance. Judge Johnson ordered the case continued until 15 February 1982 and the trial began on that date. On 15 February 1982 defendant orally moved to dismiss the indictment for the state's failure to comply with the Speedy Trial Act.

Defendant argues: (1) Judge Mills erred in failing to enter a written order following a hearing which he conducted on 16 December 1981 and at which he determined that 104 days had then elapsed in computing the time in which defendant had to be tried pursuant to the Speedy Trial Act; and (2) Judge Johnson erred in concluding that the time between the filing of defendant's motion for change of venue and its determination was excludable from the 120-day Speedy Trial Act provision, thus effectively overruling the earlier "order" of Judge Mills. We find no merit in these arguments.

---

4. According to Judge Johnson's 11 January 1982 order discussed *infra* in text, Judge Mills "excluded a portion of the time from the Speedy Trial Act" but there is no indication in the record on appeal what portions of time Judge Mills excluded or for what reason.

[1] It is well established in this jurisdiction that it is the duty of the appellant to see that the record on appeal is properly made up and transmitted. *State v. Stubbs*, 265 N.C. 420, 144 S.E. 2d 262 (1965). It is also settled that the record imports verity and the court is bound on appeal by the record as certified. *State v. Williams*, 280 N.C. 132, 184 S.E. 2d 875 (1971); *State v. Fields*, 279 N.C. 460, 183 S.E. 2d 666 (1971).

A careful review of the record on appeal and the transcript of the hearings before Judge Mills and Judge Johnson does not support defendant's argument that Judge Mills actually ruled that in computing the time in which defendant had to be tried, 104 days had elapsed as of 16 December 1981. There is some indication in the hearing transcript that Judge Mills *contemplated* such a ruling, but there is nothing to indicate that he ever so ruled. Indeed a full hearing was held later before Judge Johnson on this very point. We are bound by the record and transcript as certified. This disposes of defendant's arguments that Judge Mills erred in failing to file a written order evidencing his ruling because so far as we can know, he never made the ruling. It also disposes of defendant's argument that Judge Johnson overruled Judge Mills.

[2] Judge Johnson concluded that various periods of time, including the period between the filing of defendant's motion for change of venue on 18 September 1981 and its determination on 11 January 1982 (115 days) was excludable from the 120-day Speedy Trial Act period. This ruling was correct. *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1981).

Thus 168 days elapsed between return of the indictment, 31 August 1981, and trial, 15 February 1982. When 115 days during which the motion for change of venue was pending, not an unreasonable time under the circumstances here, is excluded, defendant was tried well within the 120-day speedy trial period.

We deem it unnecessary to determine whether Judge Johnson erred in excluding other periods of time from the 120-day period.

II.

By his third assignment of error, defendant contends that the trial court erred in denying his *pro se* motion to dismiss the bill

of indictment on the grounds of prejudicial publicity by the sheriff's department, insufficiency of the indictment to charge a crime, and insufficiency of evidence presented to the grand jury.

In his brief, defendant's counsel concedes that an examination of the bill of indictment by him reveals no fatal defects. The brief contains no further argument with respect to the contention set forth in this assignment. Thus, the question raised by this assignment of error is deemed abandoned under Rule 28(a) of the North Carolina Rules of Appellate Procedure.

Nevertheless, we have carefully reviewed defendant's motion covered by his second assignment of error and conclude that it has no merit.

### III.

[3] By his fourth assignment of error, defendant contends the trial court erred in denying his motion for a change of venue. We find no merit in this assignment.

G.S. 15A-957 provides in pertinent part:

Motion for change of venue.—If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:

(1) Transfer the proceeding to another county in the judicial district or to another county in an adjoining judicial district, or

(2) Order a special venire under the terms of G.S. 15A-958.

A motion for change of venue is addressed to the trial court's discretion and its ruling will not be disturbed on appeal absent an abuse of that discretion. *State v. Oliver*, 302 N.C. 28, 274 S.E. 2d 183 (1981); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, 448 U.S. 918 (1980). "The burden of showing 'so great a prejudice' by reason of pretrial publicity that a defendant cannot receive a fair trial is on defendant." *State v. Oliver*, 302 N.C. at 37, 274 S.E. 2d at 190; *accord, State v. Faircloth*, 297 N.C. 100, 253 S.E. 2d 890, *cert. denied*, 444 U.S. 874 (1979).

The record indicates that defendant relied on two newspaper articles and one television newscast in support of his motion for change of venue. The newspaper articles were published in late August and early September 1981 and the television broadcast appears to have been on 18 August 1981 on the 11 p.m. news. The trial took place in mid-February 1982, six months later. The newspaper articles and the TV broadcast were substantially factual and not inflammatory. The transcript does not contain the voir dire examination of prospective jurors; hence there is no showing that any juror had even read the newspaper articles or heard the broadcast.

We hold that defendant failed in the trial court to show "so great a prejudice" created by reason of this publicity that he could not receive a fair trial in Catawba County. It follows that he has shown no abuse of discretion in the trial court's denial of his motion for change of venue.

IV.

[4] By his assignments of error numbers 7 and 8, defendant contends the trial court erred in admitting evidence relating to a rifle bolt and in denying his motion for a mistrial after the evidence was admitted. We find no merit in these assignments.

The evidence tended to show that the rifle bolt complained of was found at or near the site where Marlowe's body was found. Captain Price of the Catawba County Sheriff's Department testified that the bolt, along with certain other items, were found in the snow near the body; that the bolt was placed in an envelope, and another officer's initials were written on the envelope; that the bolt was sent to the SBI laboratory in Raleigh for examination; and that it was later returned to the sheriff's department where it was kept in a locked compartment until the date of trial. On cross-examination, Captain Price stated that he did not send or take the envelope containing the bolt to Raleigh, that he did not know what was done with it in Raleigh, that he did not personally receive the envelope when it was returned to the sheriff's department, and that he had not had continuous possession of the envelope since its return from Raleigh. Captain Price did testify that he saw the bolt at the scene, that the bolt "appears to be the same one" which he observed at the scene, and

that it "does . . . look like the same one." Over defendant's objection the court admitted the bolt into evidence.

Defendant argues that the bolt should not have been admitted for the reason that the state failed to show a proper chain of custody. We perceive no error in its admission. There was no evidence connecting the bolt with defendant or any weapon owned or possessed by him. The bolt's significance was its location near the body of the deceased, not characteristics intrinsic to the bolt itself. Its location tended to corroborate Sigmon's testimony that the fatal attack took place outside the house.

The bolt's location had already been well established, without objection by defendant, by Captain Price's description of its location illustrated by photographs of the bolt taken at the scene. Finally, the bolt was sufficiently identified by Captain Price as being the one he observed at the scene so that a chain of custody foundation was not in any event required for its admissibility. *State v. Hunt*, 305 N.C. 238, 247, 287 S.E. 2d 818, 824 (1982); *State v. Silhan*, 302 N.C. 223, 250, 275 S.E. 2d 450, 471 (1981); *State v. Moore*, 301 N.C. 262, 272, 271 S.E. 2d 242, 248 (1980); 1 Brandis on N.C. Evidence § 117 n.2 (2d rev. ed. of Stansbury's N.C. Evidence 1982) (hereinafter "Brandis").

Since the court did not commit error in admitting evidence relating to the bolt, there was no error in denying defendant's motion for a mistrial based on the admission of that evidence.

V.

[5] Defendant argues that he was also entitled to have his motion for a mistrial allowed for the reason that the court erroneously allowed Captain Price to testify with respect to his appearance before the Grand Jury. He further argues that since G.S. 15A-623(e) provides that "Grand Jury proceedings are secret and . . . all persons present during its sessions shall keep its secrets and refrain from disclosing anything which transpires during any of its sessions," the court violated the public policy of this state in allowing Captain Price's testimony.

The witness testified that he went before the Grand Jury on or about 31 August 1981 in connection with the case at hand, that he could identify state's exhibit 16 as an indictment for first degree murder returned by the Grand Jury on 31 August 1981,

and that he served the indictment on defendant on 15 December 1981.

We find no merit in defendant's argument. It appears that the sole purpose in asking Captain Price about his Grand Jury appearance and his service of the indictment was to establish the dates thereof and to show that Fred Sigmon was the first person arrested for the murder in question. Captain Price said nothing about his testimony before or any other "proceedings" of the Grand Jury which must under the statute be kept secret. Except for the exact date of his appearance before the Grand Jury, Captain Price's testimony at trial involved matters of public record.

## VI.

By his ninth assignment of error, defendant contends the trial court erred in allowing the district attorney "to examine the State's principal witness concerning his prior record and lack of record for crimes of violence."

Fred Sigmon, defendant's partner in the planned robbery, was the state's principal witness. At the close of his direct examination the following questions and answers appear:

Q. Now, Mr. Sigmon, what have you ever been convicted for?

MR. BRACKETT: Objection.

COURT: Overruled. [EXCEPTION NO. 14]

A. I have been convicted of back a long time ago of breaking and entering.

Q. You recall what year that was.

A. No, I do not. Back in the early 60s.

Q. What else?

A. Well, I was, that was one incident and then I was arrested and don't know how long ago, it has been for participating in a safe robbery but since 1969, I have not been into any matters or things at all.

Q. Were you convicted of participating in the safe robbery?

A. Yes.

Q. What year was that.

A. No, I was not convicted for it. I am sorry.

Q. Have you been convicted of anything other than the breaking and entering that you mentioned?

A. No, except public drunk, that is all.

Q. You ever been convicted of any crimes of violence?

A. No, sir.

Defendant now complains of the admission of all of this testimony.

[6] Defendant objected to the question, "Now Mr. Sigmon, what have you been convicted for?" His objection raises the evidentiary question of whether the state may enhance the credibility of its witnesses by showing on their direct examination that they have no criminal record, or that their criminal record is relatively insignificant. We think it is permissible for the state, or for that matter the defendant, to do so. "In whatever way the credit of the witness may be impaired, it may be restored or strengthened by . . . evidence tending to insure confidence in his veracity and in the truthfulness of his testimony." *Jones v. Jones*, 80 N.C. 246, 250 (1879), *quoted in* 1 Brandis § 50, at 188. *See generally*, 1 Brandis § 50. Since a witness may be impeached by cross-examination about prior criminal convictions, 1 Brandis §§ 111-12, we think it is permissible for the party calling the witness to examine him on the absence of such convictions in order to enhance his credibility. The trial judge, therefore, properly overruled defendant's objection.

[7] Defendant raises a second evidentiary question when he argues that Sigmon's lack of convictions for crimes of violence was impermissibly offered to prove that it was more likely that defendant, and not Sigmon, murdered Marlowe, as Sigmon testified. Defendant specifically asserts "that evidence of the character of a person who is not a party cannot be introduced to prove that he did or did not do a particular thing, even if he is a witness." 1 Brandis § 105. Defendant did not object, however, to the question about Sigmon's prior convictions for crimes of violence. Thus, he may not complain of the elicited response on

appeal. "When there is no objection to the admission of evidence, the question of its competency is foreclosed on appeal." *State v. Stepney,* 280 N.C. 306, 316, 185 S.E. 2d 844, 851 (1972); N.C.R. App. P. 10(b)(1); 1 Brandis § 27. Had defendant objected to the question, his objection would have been waived in any event by defendant's own extensive cross-examination of Sigmon on his prior criminal record and other specific acts of misconduct. *See State v. Smith,* 290 N.C. 148, 226 S.E. 2d 10, *cert. denied,* 429 U.S. 932 (1976).

## VII.

[8] By his tenth assignment, defendant contends the trial court erred in permitting the district attorney to ask a leading question "on the crucial element of identification." There is no merit in this assignment.

This assignment relates to the testimony of John Rudisill, a neighbor of the victim. Rudisill testified: He lived about one-half mile from Marlowe. Late in the day in question he saw an automobile parked near a small road a short distance from his house. Sometime later he heard Marlowe call out, "Oh, Lordy, Oh, Lordy, don't do that." Soon thereafter he saw two men running through the woods to the parked car. Rudisill blocked the road with his truck. The two men who had entered the parked car rode up to where he had the road blocked. One of the men, whom Rudisill identified as defendant, told Rudisill to "move that damn truck." As Rudisill was moving his truck, defendant stood on the fender, pointed a pistol at Rudisill's ear and snapped it two or three times. Defendant took the keys to Rudisill's truck from him and drove away with them.

On cross-examination, defense counsel questioned Rudisill about defendant's appearance on the night in question—how he was dressed and whether he was clean-shaven or had a beard. Rudisill testified that defendant was clean-shaven "like he is to-day." He then testified that the police showed him some pictures of defendant with long hair and a beard but he "could not identify him then. He had the long hair and beard." On redirect examination by the district attorney, the witness was asked:

The reason you could not pick Mr. Dellinger out sometime ago was when you were shown the pictures, he had a beard and long hair, is that not right.

Over objection, the witness answered "yes."

Of course the question is a leading one, but we can perceive no prejudice to defendant for the reason that just before he answered this question Rudisill had stated positively on cross-examination that he could not identify defendant from the photographs because "[h]e had the long hair and beard." It is incumbent upon an appellant to show not only error but that the error prejudiced him. *State v. Brown*, 271 N.C. 250, 156 S.E. 2d 272 (1967).

## VIII.

[9] By his eleventh assignment of error defendant contends the trial court erred in admitting testimony of Faye Swink about a trip she allegedly made with defendant to Shelby, North Carolina. This assignment has no merit.

Defendant complains that the court, over his objection, permitted Faye Swink to testify that after 23 January she accompanied defendant to Shelby, North Carolina, where they checked in at a motel. Defendant had a gun with him. While the two of them were facing a mirror, defendant said "I done killed one damn man and I will blow your damn head off." Defendant then shot the mirror and "blew it all to pieces." He argues the evidence was irrelevant because the witness did not say in what year the event occurred and the evidence insofar as it showed he committed other criminal offenses was an attack on his character, impermissible because he did not take the stand or otherwise put his character in issue.

We reject both of defendant's arguments. The transcript discloses that before giving the testimony summarized above, Ms. Swink testified that she met defendant in the late sixties. She was "living with or staying with" defendant on 22 January 1970. On this night Fred Sigmon was with defendant when he picked her up at a grill. While defendant was at the grill she saw him wash his hands. Defendant said "he had to get the damn blood off of his hands." Thereafter she accompanied defendant to a drive-in where defendant stated that "I killed the damn man." Defendant had a handful of money "all wadded up" with him. She and defendant spent the remainder of that night together. It was then, after the date 22 January 1970 had been referred to several

times, that the witness was asked about a trip to Shelby after "the 23rd of January." Considered in the context of the testimony of Ms. Swink that preceded the challenged testimony, we think it clear that she was referring to January 1970.

As to the argument that the testimony reflected adversely on defendant's character in that it tended to show the commission of another offense, such as assault or destruction of property, we think the evidence was admissible to show defendant's *quo animo.* *See State v. May,* 292 N.C. 644, 235 S.E. 2d 178, *cert. denied,* 434 U.S. 928 (1977). "Where a specific mental intent or state is an essential element of the crime charged, evidence may be offered of such acts or declarations of the accused as tend to establish the requisite mental intent or state, even though the evidence discloses the commission of another offense by the accused." [Citations omitted.] *State v. McClain,* 240 N.C. 171, 175, 81 S.E. 2d 364, 366 (1954). Here the state had the burden of showing that defendant intentionally and with malice killed Marlowe. This evidence was probative and admissible on the issue of the existence of these elements.

## IX.

Defendant's final assignment of error is that the trial court erred in denying his motion to dismiss the case at the close of all evidence for insufficient evidence. Defendant's counsel concedes that there is no merit in this assignment and we agree. The evidence was more than sufficient to show every element of the offense with which defendant was charged and for which he was tried and convicted.

We conclude that defendant received a fair trial, free from prejudicial error.

No error.

Justice FRYE did not participate in the consideration or decision of this case.