STATE OF NORTH CAROLINA v. JOSEPH HEDGEPETH

No. 8310SC154

(Filed 7 February 1984)

1. **Jury § 6.3— voir dire examination—error to exclude question concerning ability of jurors to limit consideration of defendant's prior criminal record**

The trial court erred in refusing to allow defendant's attorney to question prospective jurors regarding their willingness and ability to follow the judge's instructions that they were to consider defendant's prior criminal record only for purposes of determining his credibility as a witness since, because of the similarity of the prior crimes to the one with which defendant was charged, rape, there was a real danger that a juror might consider those convictions as substantive evidence of defendant's guilt of the present rape charge. It was, therefore, crucial for defense counsel to know if a juror could follow the law and consider defendant's prior convictions only as they bore on credibility. G.S. 15A-1214(c).

**2. Criminal Law § 86— credibility of defendant—direct examination concerning prior criminal record—proper**

The trial court erred in refusing to allow defendant's counsel to ask defendant on direct examination about his prior criminal convictions since defendant was virtually assured of being cross-examined about his prior record, and defense counsel should have been allowed to question defendant on direct examination regarding his criminal record in order to enhance his credibility.

**3. Criminal Law § 86.2— error to allow State to ask defendant about plea of nolo contendere**

The State could not ask the defendant about a plea of *nolo contendere* for purposes of impeachment by prior convictions since a plea of *nolo contendere* is not a conviction; it is an implied admission of guilt only for the purposes of the case in which it is entered.

Judge HEDRICK concurs in the result.

APPEAL by defendant from *Braswell, Judge*. Judgment entered 11 October 1982 in Superior Court, WAKE County. Heard in the Court of Appeals 20 October 1983.

*Attorney General Rufus Edmisten, by Assistant Attorney General Richard H. Carlton, for the State.*

*Appellate Defender Adam Stein, by Assistant Appellate Defender James H. Gold, for defendant appellant.*

BECTON, Judge.

Defendant was indicted for first degree rape. His first trial on this charge ended in a hung jury. He was convicted of second degree rape at a second trial and was sentenced to 18 years in prison.

I

The dispositive issues on appeal relate to (a) the trial court's refusal to allow defendant's attorney to question prospective jurors regarding their willingness and ability to follow the judge's instructions regarding their consideration of defendant's criminal record; (b) the trial court's refusal to allow the defendant to disclose his criminal record on direct examination; and (c) the trial court's allowing the State to impeach defendant by questioning him about a plea of *nolo contendere*. For the reasons that follow, we order a new trial.

## II

The prosecuting witness testified that, after she and a girl-friend drank beer at a few taverns in Raleigh on the evening of 10 October 1981, the two of them walked to the Fayetteville Street Mall in downtown Raleigh, where they parted. Later, as the prosecuting witness walked down the street, she was met by defendant, who began talking to her. According to her testimony, defendant suddenly grabbed her and pushed her to the ground in a grassy area. Defendant then beat, choked, and forcibly had sexual intercourse with her. After they had intercourse, defendant offered to call a cab for her at his house. She walked with him to a house where, instead of calling a cab, defendant told her to remove her clothes and to get in bed. She had sexual intercourse with defendant seven or eight times that night, submitting because defendant threatened to "put [her] in the freezer box," and because one time she saw defendant with a knife. Further, every time she tried to run, defendant hit her.

The next morning, defendant walked her to a bus stop near a coffee shop, It was daylight, and there were other people near the bus stop. When the prosecuting witness declined defendant's offer to buy her coffee, defendant left her alone for approximately ten minutes while he was in the coffee shop. When defendant returned from the coffee shop, he gave her a few dollars and some change to get a bus. She then went inside the coffee shop and telephoned her girlfriend, who agreed to meet her at the court house. When she came back out, defendant was gone.

The prosecuting witness was examined later that morning at Wake Medical Center. The examining physician testified that she had prominent contusions about the face, neck and left leg, which had been sustained within the past twelve to twenty-four hours. He performed routine sexual assault examinations and did not notice anything particularly remarkable. There was no evidence of trauma on the pelvic examination.

Ms. Boykin, the girlfriend, testified that the prosecuting witness did not have any marks or bruises on her person when she last saw her on the night in question. When they met the next morning, the prosecuting witness' hair was messed up, and she had bruises all over her neck. Three other people who had

seen the prosecuting witness the night before also testified that they observed no bruises or marks on her that night.

The prosecuting witness at some point identified the house where the alleged rape occurred, although it was a different house than the one she had identified initially. However, she was unable at any time to locate for police the grassy area where she was first allegedly raped.

Defendant's testimony was altogether different. He testified that he was driving down the street when he saw the prosecuting witness standing on the corner. He pulled over and asked her what she was doing. She told him "she was out having fun." He replied that he "would like to have some fun with her." She got into his car, and he drove to his house, where he lived with his mother and two children. After they went into the house, the prosecuting witness asked for twenty dollars. After he gave her fifteen dollars, she got in bed and had intercourse with him. The next morning, he walked her to the bus stop because his car would not start. After he gave her twenty cents to make a phone call, she disappeared.

## III

[1] Defendant's first contention is that the trial court erred in refusing to allow his attorney to question prospective jurors regarding their willingness and ability to follow the judge's instructions that they were to consider defendant's prior criminal record only for purposes of determining his credibility as a witness.

Pursuant to N.C. Gen. Stat. § 15A-1214(c) (1978), a defendant's counsel is allowed to question prospective jurors individually regarding their competence and fitness to serve as jurors to determine whether there is a basis to challenge for cause or to exercise a peremptory challenge. "Each defendant is entitled to full opportunity to face the prospective jurors, make diligent inquiry into their fitness to serve, and to exercise his right to challenge those who are objectionable to him." *State v. Thomas*, 294 N.C. 105, 115, 240 S.E. 2d 426, 434 (1978). Indeed, our jury selection system "permit[s] parties to protect themselves against prejudice by allowing them to exclude unacceptable jurors." *State v. Woods*, 286 N.C. 612, 619, 213 S.E. 2d 214, 220 (1975), *death*

*sentence vacated*, 428 U.S. 903, 49 L.Ed. 2d 1208, 96 S.Ct. 3207 (1976).

It is true that G.S. § 15A-1214(c) does not permit counsel to ask jurors the "kind of verdict they would return under certain named circumstances" or to "fish for answers to legal questions before the judge has instructed the juror on applicable legal principles by which the juror should be guided"; however, counsel is permitted to ask jurors if they would follow the trial judge's instructions. *State v. Phillips*, 300 N.C. 678, 682, 268 S.E. 2d 452, 455 (1980). In *Phillips*, the defense counsel asked a prospective juror if the defendant would have to prove anything to her before defendant would be entitled to a verdict of not guilty. At that point, the trial court intervened, but permitted counsel to ask all twelve jurors if they would follow the judge's instructions that the burden is on the State to prove the defendant guilty beyond a reasonable doubt.

In the present case, defendant's counsel was not "fishing" or "staking the jurors out," by questioning them as to the kind of verdict they would render or how they would be inclined to vote under a particular set of facts. *State v. Vinson*, 287 N.C. 326, 215 S.E. 2d 60 (1975), *death sentence vacated*, 428 U.S. 902, 49 L.Ed. 2d 1206, 96 S.Ct. 3204 (1976). Defendant's counsel merely wanted to ask the jurors the same type of question the trial court allowed and which the Supreme Court approved in *Phillips*, that is, whether the juror would be able to follow the judge's instructions, in this case, regarding their consideration of defendant's prior convictions.

The request was squarely put to the trial judge. The following occurred just prior to jury *voir dire*:

> MR. CRUMPLER: Will I be prohibited from asking the juror whether—well, first of all, will I be prohibited from informing the jury that my client is going to testify and it will come out in evidence that he has a criminal record *and if the Court instructs the jurors* that may be considered only for the purpose of determining his credibility would it—*would they follow the Court's instructions*. [Emphasis added.]
>
> May I ask such a question?

THE COURT: Flatly you are prohibited from doing so.

Further, the trial court was fully aware of defendant's contentions as they had already been asserted in pre-trial motions and an affidavit from defense counsel. By way of example, defense counsel stated the following, among other things, in his affidavit:

> 2. I have discussed the case at length with my client and have read a partial transcript of the last trial. My client's criminal record was put in issue at that trial, obviously for the purposes of impeachment although the district attorney, Mike Payne, asked about other offenses that my client denied being convicted for. Apparently my client has no record of convictions except in Wake County, North Carolina. In looking through the records in the Office of the Clerk of Superior Court of Wake County and in talking with my client, it appears that his criminal record of convictions is confined to the following:
>
> > a. 1962—assault with intent to commit rape and assault on a female, and a subsequent escape;
> >
> > . . .
> >
> > c. 1971—assault and battery;
> >
> > . . .
> >
> > e. 1978—assault with intent to commit rape (upon a plea of no contest);
> >
> > f. 1981—assault on a female (his sister).
>
> 3. My client believes that the only attorneys he has ever had representing him were me (for the 1978 plea of no contest to assault with intent to commit rape and presently) and Howard Manning, Jr. in this case. Particularly, he does not recall having an attorney in 1962. . . . To the best of his recollection he does not believe that he ever signed a waiver of his right to appointed counsel, and he does not believe that he was in a position to employ an attorney in those other instances.
>
> . . .

6. I am very much concerned, based upon my experience as a trial attorney, that numerous questions concerning Mr. Hedgepeth's record could be inflammatory and create bias in the jury against him. Moreover, I did review the court files for the two assault offenses in 1962. There is no reference in the files indicating that Mr. Hedgepeth had an attorney. Further, from the files it appears that he was 15 years old at the time of those offenses; he was processed through the domestic relations court and bound over to Superior Court. Considering the nature of this case, a rape case, I am particularly concerned that those assault offenses could inflame the jury even though they are nearly 20 years old. It seems to me that the probative value with respect to credibility of those offenses in particular is outweighed by their inflammatory nature.

Based on the district attorney's questions at the first trial which ended in a hung jury, defense counsel had every reason to believe that the State would proceed in similar fashion. And the State did. Relevant portions of the transcript follow:

Q. Is it correct that in 1981 you were convicted of an assault on a female charge against your sister?

A. Yes, I were.

Q. And is it correct that in 1978 you plead no contest and received an active sentence in the penitentiary for a charge of assault with intent to commit rape?

A. Yes, I did.

Q. The victim in that case was a relatively young white female, is that correct?

MR. CRUMPLER: Objection.

THE COURT: Overruled.

A. Yes.

THE COURT: You may answer.

A. Yes, it were.

    . . .

Q. Mr. Hedgepeth, is it correct to say that in the year 1962 that you on two separate occasions committed acts of violence against female persons?

A. Yes.

MR. CRUMPLER: Objection.

THE COURT: Overruled.

Q. Do you now recall the names of the victims involved in those two incidents?

A. No.

Q. And at least one of those incidents was a physical assault of a sexual nature, was it not?

MR. CRUMPLER: Objection.

THE COURT: Overruled. You may answer.

A. Yes, it were.

Q. Is it accurate, Mr. Hedgepeth, to say that in the year 1969 you committed two separate assaults, one against a female and one against another person?

A. I do not think—I do not—

. . .

A. I do not recall in '69, no, sir, I don't.

Q. Mr. Hedgepeth, isn't it correct that you were convicted of two separate assaults in 1969, one being an assault on a female for which you got a ten-day sentence and the other being an assault against some other person for which you got a thirty-day sentence?

A. No, sir, it's not.

. . .

Because of the similarity of these prior crimes to the one with which defendant was charged, rape, there was a real danger that a juror might consider these convictions as substantive evidence of defendant's guilt of the present rape charge. It was, therefore, crucial for defense counsel to know if a juror could fol-

low the law and consider defendant's prior convictions only as they bore on credibility. *See State v. Wallace,* 54 N.C. App. 278, 283 S.E. 2d 404 (1981). As Chief Justice Warren Burger noted while a judge on the Federal Court of Appeals:

> Where multiple convictions of various kinds can be shown, strong reasons arise for excluding those which are for the same crime because of the inevitable pressure on lay jurors to believe that "if he did it before he probably did so this time."

*Gordon v. United States,* 383 F. 2d 936, 940 (D.C. Cir. 1967).

The reference to "inevitable pressure on lay jurors" in *Gordon* and in *Wallace* is a candid recognition, no different than Alfred Lord Tennyson's recognition in *Ulysses,* that jurors—like all of us—are "a part of all that [they] have met." Jurors, like all of us, have natural inclinations and favorites, and they sometimes, at least on a subconscious level, give the benefit of the doubt to their favorites. So jury selection, in a real sense, is an opportunity for counsel to see if there is anything in a juror's yesterday or today that would make it difficult for that juror to view the facts, not in an abstract sense, but in a particular case, dispassionately. We, therefore, conclude that prohibiting defense counsel from questioning potential jurors as to their willingness and ability to follow the judge's instructions limiting their consideration of the defendant's prior record to the issue of his credibility was error, and a misapplication of the law set forth in *State v. Phillips.*

Other courts have reached similar conclusions. In *State v. Ziebert,* 34 Or. App. 497, 579 P. 2d 275 (1978), defense counsel sought to question prospective jurors concerning their possible bias against the defendant, who was charged with burglary, because of his prior forgery conviction. The *Ziebert* Court said:

> Further, defendant's prior conviction of forgery involved, as did the burglary with which he was charged here, an element of theft. It is true that the trial court did instruct the jury to treat defendant's prior convictions as affecting only the defendant's credibility as a witness; however, that is not a substitute for counsel's right to inquire into the individual juror's attitude toward convicted felons in an attempt to determine the ability of the jurors to be guided by the

court's instructions. Under these circumstances, we conclude that the trial court's limitation of defendant's voir dire questioning constituted prejudicial error.

*Id.* at 502, 579 P. 2d at 277; *see also United States v. Baldwin,* 607 F. 2d 1295 (9th Cir. 1979).

## IV

[2]  Defendant next assigns error to the trial court's refusal to allow defendant's counsel to ask defendant on direct examination about his prior criminal convictions.

In refusing to allow defendant's counsel to question defendant about his criminal record, the trial court cited the rule that a party cannot impeach its own witness. This rule is largely based upon the premise that the calling party vouches for the credibility of its witnesses, and presents the witness' testimony as being worthy of belief. *State v. Tilley,* 239 N.C. 245, 79 S.E. 2d 473 (1954). This rule, however, has been criticized for a long time by the commentators on the law of evidence.[1] *Id.; see* 3 A. Wigmore, Evidence §§ 896-99 (Chadbourn rev. 1970); *McCormick's Handbook of the Law of Evidence* § 38 (E. Cleary 2d ed. 1972). Moreover, this rule seems to have been modified by our Supreme Court.

In *State v. Dellinger,* 308 N.C. 288, 302 S.E. 2d 194 (1983), our Supreme Court held that it is permissible for a party to enhance the credibility of its witnesses by showing, on direct examination, that the witness has no criminal record, or that his record is relatively insignificant. The Court quoted the following from an 1879 decision: "In whatever way the credit of the witness may be impaired, it may be restored or strengthened by . . . evidence tending to insure confidence in his veracity and in the truthfulness of his testimony." *Dellinger,* 308 N.C. at 299, 302 S.E. 2d at 200 (quoting *Jones v. Jones,* 80 N.C. 246, 250 (1879)); *see generally* 1 Brandis, *Brandis on North Carolina Evidence* § 50, at 186-89 (2d rev. ed. 1982). Since a witness could be impeached by cross-examination about prior criminal convictions, the calling

1. The new Code of Evidence in North Carolina, which becomes effective 1 July 1984, has abolished the rule. Rule 607 provides: "The credibility of a witness may be attacked by any party, including the party calling him." 1983 N.C. Adv. Legis. Serv., ch. 701.

party is entitled to enhance the witness' credibility by examining him on the absence of such convictions.

Ordinarily, when a defendant is not permitted to testify on direct examination regarding his prior criminal record and the prior record is elicited during cross-examination, the defendant sustains a double blow to his credibility—aside from the obvious effect of the prior conviction, defendant's credibility is hurt because the jury is left with the impression that the defendant tried to hide his criminal record and was not being entirely truthful. Allowing the defendant to testify on direct examination, rather than detracting from his credibility, may actually bolster his credibility because the jury may believe that the defendant is being completely open and straightforward and worthy of belief. Defendant's counsel surely was not attempting in the present case to attack defendant's veracity as a witness. Consequently, he should not be accused technically of impeaching his own witness.

The outcome in a rape case in which the defense of consent is raised often turns upon whom the jurors choose to believe—the defendant or the prosecuting witness. The credibility of each is therefore crucial. Since defendant was virtually assured of being cross-examined about his prior record, defendant's counsel should have been allowed to question defendant on direct examination regarding his criminal record in order to enhance his credibility. Defendant had everything to gain and nothing to lose.

V

[3]  Defendant's next assignment of error relates to the following cross-examination of defendant by the State:

Q. And is it correct that in 1978 you plead no contest and received an active sentence in the penitentiary for a charge of assault with intent to commit rape?

A. Yes, I did.

Q. The victim in that case was a relatively young white female, is that correct?

MR. CRUMPLER: Objection.

THE COURT: Overruled.

A. Yes.

Defendant argues that the State could not ask defendant about his plea of *nolo contendere* or about the details of the underlying crime.

In North Carolina, a plea of *nolo contendere* is not a conviction; it is an implied admission of guilt only for the purposes of the case in which it is entered. *State v. Thomas*, 236 N.C. 196, 72 S.E. 2d 525 (1952); *see also State v. Stone*, 245 N.C. 42, 95 S.E. 2d 77 (1956); *North Carolina State Bar v. Hall*, 293 N.C. 539, 238 S.E. 2d 521 (1977). The State, therefore, may not ask the defendant about the plea of *nolo contendere* for purposes of impeachment by prior convictions. The State may, however, for purposes of impeachment by prior misconduct, ask the witness whether he committed the crime, as long as the question is not phrased in terms of arrests, indictments, convictions, sentences, or pleas. *See State v. Suits*, 296 N.C. 553, 251 S.E. 2d 607 (1979).

Indeed, in the present case, the trial court, in ruling upon a motion *in limine* by defendant to prevent the State from inquiring into the plea, instructed the State that it could cross-examine about prior acts of misconduct, as long as the question *was not phrased*, "Have you been convicted of Y and Z conduct or misconduct?" The State's question, therefore, was in violation of the trial court's directive, and the trial court should have interrupted *ex mero motu*.

The error was compounded by the second question. Because the first question was improper, the second question had no foundation. It had not been established that defendant had committed the 1978 assault with intent to commit rape. The error was prejudicial because it led the jury to believe that defendant, a black, had a propensity to rape white girls. The victim in the present case was a seventeen year old white girl.

## VI

These errors, when considered together, mandate the award of a new trial. The evidence of defendant's guilt is not overwhelming. Indeed, a first trial ended in a hung jury. The prosecuting witness' own testimony presents a scenario arguably inconsistent with rape. The morning after the alleged rape, the defendant walked her to a bus stop, offered to buy her some coffee, and

gave her some money and some change for bus fare. She did not flee when the defendant went into the coffee shop for ten minutes.

## VII

Since we are ordering a new trial, defendant's remaining assignments of error have been rendered moot, or are not likely to recur at retrial. We will, however, summarily discuss one evidentiary point which is likely to recur at retrial. Simply put, for purposes of impeachment by prior misconduct, the State may ask the defendant whether he committed acts similar in nature to the one charged, and the question must be framed in sufficient detail to identify the act. *See State v. Shane*, 304 N.C. 643, 285 S.E. 2d 813 (1982).

New trial.

Chief Judge VAUGHN concurs.

Judge HEDRICK concurs in the result.